IN RE the MARRIAGE OF:

Jane E. CHEN, Petitioner-Respondent,

v.

John J. WARNER, Respondent-Appellant-Petitioner.

Supreme Court

*No. 2003AP288. Oral argument February 4, 2005.—Decided May 6, 2005.*

## 2005 WI 55

(Also reported in 695 N.W.2d 758.)

For the respondent-appellant-petitioner there were briefs by *Linda Roberson, Holly J. Slota* and *Balisle & Roberson, S.C.,* Madison, and oral argument by *Linda Roberson.*

For the petitioner-respondent there was a brief by *James Kurth,* Wausau, *Kent A. Tess-Mattner* and *Schmidt Rupke Tess-Mattner & Fox, S.C.,* Brookfield, and oral argument by *Kent A. Tess-Mattner.*

¶ 1. SHIRLEY S. ABRAHAMSON, C.J. This is a review of a published decision of the court of appeals[1] affirming an order of the circuit court for Wood County, James M. Mason, Judge. The circuit court granted Jane E. Chen's (the mother's) motion to amend the child support portion of a divorce judgment to require John J.

---

[1] *Chen v. Warner,* 2004 WI App 112, 274 Wis. 2d 443, 683 N.W.2d 468.

Warner (the father) to pay $4,000 per month in child support. The circuit court rejected the father's argument that the mother's actions constituted "shirking" and declined to use the mother's earning capacity rather than her actual income in determining whether to award child support.

¶ 2. The court of appeals affirmed the circuit court's order that the mother's decision to forgo employment outside the home to become an at-home full-time child care provider was reasonable and did not constitute shirking. We affirm the decision of the court of appeals.

¶ 3. Two issues are presented. The first is the correct standard of appellate review applicable to the circuit court's determination of reasonableness. The circuit court determined that the mother's failure to return to work was reasonable and did not constitute shirking. We conclude that the proper standard of appellate review of a circuit court's determination of reasonableness in a child support shirking case is that an appellate court should independently determine the issue of reasonableness, giving appropriate deference to the circuit court.

¶ 4. The second issue is whether the circuit court erred in determining that the mother's decision to forgo employment outside the home and become an at-home full-time child care provider was reasonable under the circumstances. Examining the issue of reasonableness independently as a question of law, yet giving appropriate deference to the circuit court, we conclude that the mother's decision was reasonable under the circumstances. A number of factors weigh on this conclusion. The parents agreed that, if feasible, it was better for the children to have a parent at home full time instead of having both parents working full time or part time

outside the home. The mother was unable to find part-time employment within commuting distance of the home. The father was able to make additional expenditures for the children without an impact on his standard of living or his short-term or long-term financial health.

I

¶ 5. The material facts are undisputed. The case at bar arises out of a post-divorce motion to modify child support. The mother and father, both physicians, were divorced in 1999 after an 18–year marriage. They have three children, born in 1991, 1993, and 1995.

¶ 6. The judgment of divorce incorporated the parties' agreement. It provided for joint custody and equal physical placement. The children spent alternating weeks with each parent. The judgment provided that neither party would pay child support to the other; each would be responsible for the children's daily expenses when they were in his or her care.[2] Reasonable clothing expenses and other mutually agreed-upon expenses incurred on behalf of the children were equally divided. The father, however, was to pay $400 per child per month into a fund for the children's future education.

¶ 7. At the time of the divorce, both parties were employed full time at the Marshfield Clinic. The mother earned $19,670 per month, or $236,000 per year. The

[2] The agreement was somewhat inartfully drafted to provide for a waiver of child support. Divorcing parents cannot "waive" child support. They cannot give up the children's present and future rights to receive child support. Waivers of child support are void as against public policy. *See Ondrasek v. Tenneson,* 158 Wis. 2d 690, 695–97, 462 N.W.2d 915 (Ct. App. 1990).

father earned $21,371 per month, or $256,452 per year. Both parents worked outside the home during the marriage.

¶ 8. After the divorce, the mother sought to reduce her employment to be more available for the children, who were of school age or nearing it. Both parents apparently agree that it is in the best interests of their children to have, if feasible, child care provided by a parent. The father testified at the child support modification hearing that, when possible, it was important to have a parent at home full time with the children rather than have someone else care for the children.

¶ 9. The mother voluntarily left her full-time position at the Marshfield Clinic in May 2000 when she was unable to reduce her schedule there to part time.

¶ 10. Leaving her position was not a rash decision. Prior to terminating her employment, the mother had consulted with a financial advisor and was advised that from her $1.1 million savings, she could expect an annual income of about $110,000. This sum was significant, but was less than the income she earned as a physician. The estimate of $110,000 was based on stock market returns over the past 50 years. The mother's estimated budget was $7,000 per month, or $84,000 per year. Because her expected income exceeded her budget, the mother did not seek child support from the father.

¶ 11. The stock market decline in 2001 took a toll on the mother's investment income. That year she earned only $32,000. In response to the income decline, the mother began to look for employment and began invading her assets in order to meet her and the children's expenses. The job search failed to yield any part-time opportunities within commuting distance of her home, although she could have obtained

alternating-week work in distant communities. She did not want to live away from home during alternate weeks, so she declined to pursue those opportunities.

¶ 12. In 2002, the mother filed a motion to amend the divorce judgment to require the father to pay child support. She asserted a substantial change in circumstances to justify a child support award. Her income had diminished substantially; the father's income had increased.

¶ 13. Had the mother continued employment at the Marshfield Clinic, she would have been earning $415,000 per year. The father was earning $472,000 per year when the motion was filed in 2002, nearly twice what he earned at the time of the divorce. In addition, his employer contributed $73,000 per year to his retirement plan. The father had assets of $1,218,185, not including securities. He was eligible for nine weeks of paid vacation per year and two weeks of paid meeting time. He maintains three residences.

¶ 14. The father's monthly budget was $8,400, leaving him with discretionary income of $12,000 per month. The mother requested $4,000 per month in child support based on a monthly budget of $7,000.

¶ 15. The circuit court ordered the father to pay child support in the amount of $4,000, but excused him from his obligation to pay $1,200 per month into the children's education fund. Thus, the net effect of the circuit court's order is to require the father to pay an additional $2,800 per month for the children's support.

¶ 16. Not working outside the home full time has enabled the mother to spend significantly more time with the children. This increased time with the children also includes periods during the weeks when the father has placement of the children. She shepherds the children to medical appointments, attends their school

activities, does volunteer work at the school, communicates more with their teachers, transports the children to their various extracurricular activities (tae kwon do, ballet, knitting, dancing, piano lessons), and monitors their participation in all their endeavors.

¶ 17. The record is also replete with evidence of the father's involvement in the children's lives.

¶ 18. By all accounts, the children were doing well and their needs were met before the mother left employment at the Marshfield Clinic, and they have continued to do well thereafter.

¶ 19. The father argued in the circuit court and on appeal that the mother's termination of employment in 2000 and her refusal to seek part-time work outside the Marshfield area were unreasonable and amounted to shirking her obligation to support their children.

II

■

¶ 20. Before we decide the two issues presented, we must explain the legal principles involved in the present case. This is a child support modification case. The father asserts that in determining child support the circuit court should have used the mother's earning capacity, not her actual earnings. Obviously, in the present case there is a significant difference between the two numbers. A circuit court would consider a parent's earning capacity rather than the parent's actual earnings only if it has concluded that the parent has been "shirking," to use the awkward terminology of past cases. To conclude that a parent is shirking, a circuit court is not required to find that a former spouse deliberately reduced earnings to avoid support obligations or to gain some advantage over the other party. A

circuit court need find only that a party's employment decision to reduce or forgo income is voluntary and unreasonable under the circumstances.

¶ 21. The parties, the circuit court, the court of appeals and this court agree that the mother's decision to reduce her income from employment outside the home was voluntary.

¶ 22. The focus of the parties' dispute is whether the mother's decision to forgo employment outside the home to become an at-home full-time child care provider was reasonable under the circumstances. If the mother's decision was reasonable, the circuit court's order increasing child support will be affirmed. If the mother's decision was unreasonable, the circuit court's order must be reversed. The circuit court determined that the mother's decision was reasonable under the circumstances. The court of appeals agreed.

¶ 23. The test of reasonableness under the circumstances is derived from the case law. In *Balaam v. Balaam*,[3] one of the early intentional shirking cases relating to alimony and child support, this court declared that the paying spouse should be afforded "a fair choice" of a means of livelihood as well as the ability to pursue what the spouse honestly feels are the best opportunities, even though the present financial return may be reduced from prior employment. The court further said that "[t]his rule is, of course, subject to reasonableness commensurate with [the spouse's] obligations to [the] children and [the former spouse]."[4] The phrase "subject to reasonableness commensurate with a spouse's obligations to the children" has been repeated in numerous shirking cases, including unintentional

---

[3] *Balaam v. Balaam*, 52 Wis. 2d 20, 187 N.W. 867 (1971).

[4] *Id.* at 28.

shirking cases.[5] The phrase "commensurate with a spouse's obligations to the children" does not explicitly refer to obligations of financial support; it includes other obligations, such as child care.

¶ 24. In several cases the court of appeals has stated that a circuit court may consider a spouse's earning capacity when determining a support obligation to a child if it finds a spouse's job choice voluntary and unreasonable under the circumstances, omitting the words "commensurate with [his or her] obligations to the children."[6] This court has cited at least one of these cases with approval.[7]

■

¶ 25. Whether the shirking test is phrased as "voluntary and reasonable" or with the additional language "commensurate with the obligations to the children," an examination of the discussions and decisions in the cases demonstrates that they are the same. The rule derived from the cases is that "[a] parent remains obligated to make reasonable choices that will not deprive his or her children of the support to which they

---

[5] *See, e.g., Edwards v. Edwards,* 97 Wis. 2d 111, 119, 293 N.W.2d 160 (1980); *Kelly v. Hougham,* 178 Wis. 2d 546, 554–55, 504 N.W.2d 440 (Ct. App. 1993); *Smith v. Smith,* 177 Wis. 2d 128, 136–38, 501 N.W.2d 850 (Ct. App. 1993); *Van Offeren v. Van Offeren,* 173 Wis. 2d 482, 492, 495–97, 496 N.W.2d 660 (Ct. App. 1992); *In re R.L.M.,* 143 Wis. 2d 849, 853, 422 N.W.2d 890 (Ct. App. 1988).

[6] *See, e.g., Finley v. Finley,* 2002 WI App 144, ¶ 12–15, 256 Wis. 2d 508, 648 N.W.2d 536; *Sellers v. Sellers,* 201 Wis. 2d 578, 587, 549 N.W.2d 481 (Ct. App. 1996).

[7] *See Rottscheit v. Dumler,* 2003 WI 62, ¶ 21, 262 Wis. 2d 292, 664 N.W.2d 525 (citing *Sellers* with approval and noting that shirking may exist when a payer makes a voluntary and unreasonable decision about his or her employment).

are entitled."[8] The cases uniformly state, in one way or another, that in considering a spouse's conduct in voluntarily reducing his or her income, a court applies a test of reasonableness under the circumstances.[9] The case law recognizes that the words "subject to reasonableness commensurate with a spouse's obligations to the children" mean that a court balances the needs of the parents and the needs of the child (both financial and otherwise, like child care) and the ability of both parents to pay child support.

¶ 26. Furthermore, Wis. Stat. § 767.25(1m)(d) and (e)[10] provide that a court may modify the amount of child support payments under the percentage standard if, after considering the listed economic factors, "[t]he desirability that the custodian remain in the home as a

---

[8] *Modrow v. Modrow,* 2001 WI App 200, ¶ 21, 247 Wis. 2d 889, 634 N.W.2d 852.

[9] *See, e.g., Edwards,* 97 Wis. 2d at 121 (examination of individual equities in each case is required); *Finley,* 256 Wis. 2d 508, ¶¶ 13–15 (test in shirking is reasonableness); *Sellers,* 201 Wis. 2d at 587 (test in shirking is reasonableness); *Kelly,* 178 Wis. 2d at 557 ("[R]easonableness of the conduct is the standard . . . ."); *Smith,* 177 Wis. 2d at 138–39 ("[T]he payor's earning capacity may be considered when the payor's termination of employment resulting in lower earnings is voluntary and unreasonable."); *Van Offeren,* 173 Wis. 2d at 492, 498 ("[R]easonableness of the conduct is the standard" in determining whether to consider a parent's earning capacity rather than actual earnings.); *R.L.M.,* 143 Wis. 2d at 853 (circuit court may structure child support order considering needs of both the father and the child). *See also Rottscheit,* 262 Wis. 2d 292, ¶ 21 (shirking may exist when a payer makes a voluntary and unreasonable decision about his or her employment).

[10] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise indicated.

full-time parent," and "the value of custodial services performed by the custodian if the custodian remains at home," the court concludes that the percentage standard is unfair to the child or to any of the parties. Thus the legislature has explicitly recognized that in establishing financial child support obligations a circuit court considers the desirability and value of child care services performed by a custodian.

¶ 27. The circuit court, the court of appeals, and the parties all applied a test of reasonableness under the circumstances in the present case. So do we.

¶ 28. We now turn to the standard of appellate review of the circuit court's ruling on the reasonableness of the mother's decision to forgo employment outside the home to become an at-home full-time child care provider.

III

¶ 29. Determining the standard of appellate review is a question of law that this court decides independently of the court of appeals, but benefiting from its analysis.

¶ 30. In arguing about the standard of appellate review applicable here, each parent relies on a different line of cases, and the court of appeals relies on a third line of cases. The father points to a line of cases in which an appellate court independently reviews a circuit court's finding of reasonableness when the facts are undisputed. The mother points to a line of cases in which an appellate court reviews a circuit court's determination of child support for an erroneous exercise of discretion. The court of appeals in the present case

relied on yet another line of cases, in which the appellate court gives deference to a circuit court's determination of reasonableness.

¶ 31. The father rests his position that an appellate court determines the reasonableness of a parent's decision to forgo income independently of the circuit court (and without deference to the circuit court) on *Ozaukee County v. Flessas,* 140 Wis. 2d 122, 409 N.W.2d 408 (Ct. App. 1987), and other non-family-law court of appeals cases.[11] The *Flessas* case deals with reasonableness in the context of a laches defense. The court of appeals appears to have determined in these cases that when the facts are undisputed or the evidence is documentary and the circuit court has to determine reasonableness, that is, whether the facts satisfy the legal standard, appellate review of the circuit court's ruling on reasonableness is a question of law that the court of appeals determines independently without deference to the circuit court.[12]

¶ 32. In contrast, the mother analogizes the determination of the reasonableness of a parent's decision to forgo employment outside the home and become an at-home full-time child care provider to the run-of-the-

[11] *Kernz v. J.L. French Corp.,* 2003 WI App 140, ¶ 29, 266 Wis. 2d 124, 667 N.W.2d 751 (involving question of reasonableness in dispute over liquidated damages in contracts setting); *Garcia v. Regent Ins. Co.,* 167 Wis. 2d 287, 303, 481 N.W.2d 660 (Ct. App. 1992) (summary judgment involving question of reasonableness in dispute over insurance coverage).

[12] In *Ozaukee County v. Flessas,* 140 Wis. 2d 122, 409 N.W.2d 408 (Ct. App. 1987), the court of appeals, relying on *Wassenaar v. Panos,* 111 Wis. 2d 518, 525, 331 N.W.2d 357 (1983), held that weight should be given to a circuit court's conclusions when factual and legal determinations are so intertwined.

mill child support modification cases. She argues that in those cases a circuit court's decision to modify child support after divorce is discretionary and will not be overturned absent an erroneous exercise of discretion. Discretion is properly exercised when the decision reflects a rational reasoning process based on the application of the correct legal standard to the facts.[13] The mother urges us to apply the erroneous exercise of discretion standard of appellate review to the reasonableness determination in the present child support modification case.[14]

¶ 33. The court of appeals takes a third approach to the standard of appellate review of the reasonableness of a parent's decision to forgo employment outside the home to become an at-home full-time child care provider: It "accord[s] 'appropriate deference' to circuit court determinations of the reasonableness of decisions to reduce or forgo income."[15]

¶ 34. The court of appeals relied on *Van Offeren v. Van Offeren*[16] for its standard of appellate review.[17] The

---

[13] *See, e.g., Abitz v. Abitz,* 155 Wis. 2d 161, 174, 455 N.W.2d 609 (1990).

[14] The mother's approach is supported by *Finley,* 256 Wis. 2d 508, ¶¶ 13–15, in which the court of appeals concluded that basing maintenance on the spouse's actual earnings rather than imputed earnings is a discretionary decision to be reviewed for erroneous exercise of discretion.

[15] *Chen,* 274 Wis. 2d 443, ¶ 13.

[16] *Van Offeren v. Van Offeren,* 173 Wis. 2d 482, 496 N.W.2d 660 (Ct. App. 1992).

[17] *See also Sellers,* 201 Wis. 2d at 587 ("The issue whether Kelly's job choice is unreasonable presents a question of law. However, we will give appropriate deference to the trial court's legal conclusion because it is so intertwined with factual findings supporting that conclusion.") (citation omitted).

*Van Offeren* case involved a post-divorce motion for temporary elimination of child support and maintenance payments.[18] The question was whether William Van Offeren's decision to terminate his employment at Johnson Wax was reasonable. The *Van Offeren* court, citing *Flessas* (which was, in turn, based on this court's decision in *Wassenaar v. Panos*[19]), concluded that although the application of a legal standard, here reasonableness, to the facts is a question of law determined independently by an appellate court, when a legal conclusion is extensively intertwined with factual conclusions, an appellate court should give appropriate deference to the circuit court,[20] but that the circuit court's decision is not controlling.[21]

¶ 35. The court of appeals in the instant case "interpret[ed] [the *Van Offeren*] standard of review to mean that if the circuit court reached a conclusion that a reasonable court could reach based on the record before the court, [the court of appeals] will defer to that conclusion. Deferring to circuit court determinations in family law cases is the norm, and [the court of appeals] see[s] no reason to deviate in this instance."[22]

¶ 36. In affirming the circuit court, the court of appeals stated its holding in light of its application of the *Van Offeren* standard of appellate review as follows: "We hold only that, in this case, a reasonable trial judge could determine that [the mother's] decision to forgo part-time work—work that would take her away from

---

[18] *Van Offeren*, 173 Wis. 2d at 487.

[19] *Wassenaar v. Panos*, 111 Wis. 2d 518, 331 N.W.2d 357 (1983).

[20] *Van Offeren*, 173 Wis. 2d at 492–93.

[21] *Wassenaar*, 111 Wis. 2d at 525.

[22] *Chen*, 274 Wis. 2d 443, ¶ 13.

the children every other week—was reasonable in light of [the father's] ability to pay child support and the benefits to the children."[23]

¶ 37. The father contends that the court of appeals' holding and its interpretation of *Van Offeren,* as we have set them forth above, deviate from *Van Offeren* and the case law on which *Van Offeren* is based. We understand the father's concern. The court of appeals' interpretation of *Van Offeren* could be viewed as incorrectly equating the *Van Offeren* standard of appellate review with the erroneous exercise of discretion standard of appellate review.[24]

¶ 38. But there is a difference. An erroneous exercise of discretion standard is more deferential to the circuit court's ruling than the *Van Offeren/Wassenaar* standard of appellate review. The *Van Offeren/Wassenaar* standard recognizes the issue of reasonableness as a question of law, but one in which an appellate court should give "appropriate deference" to the circuit court's ruling. Of course, no case law has or can define "appropriate" or quantify the deference due the circuit court. All one can say is that an appellate court gives weight to the circuit court's decision.

---

[23] *Id.,* ¶ 52.

[24] For cases stating that a circuit court has not erroneously exercised its discretion if the circuit court's decision falls within a range of reasonableness, see, *e.g., State ex rel. M.L.B. v. D.G.H.,* 122 Wis. 2d 536, 542, 363 N.W.2d 419 (1985) ("An appellate court will not find an [erroneous exercise] of discretion if the record shows that the circuit court exercised its discretion and that there is a reasonable basis for the court's determination."); *Lewandowski v. Preferred Risk Mut. Ins. Co.,* 33 Wis. 2d 69, 78, 146 N.W.2d 505 (1966) (Because "reasonable [people] may differ, the trial court's determination [under an erroneous exercise of discretion standard] will be upheld if it falls within a range of reasonableness.").

¶ 39. We must decide which of these three possible standards of appellate review applies to a circuit court's determination of reasonableness in a shirking case. Determining the appropriate standard of review depends on the function of appellate review and the institutional strengths of trial and appellate courts. An appellate court's independent determination of an issue is appropriate when uniformity is needed or when an issue is of such importance that review by a multiple-judge collegial appellate court is needed.[25] Uniformity is important for giving courts and litigants clear guidance on legal principles.

¶ 40. Deference to a circuit court ruling is appropriate when the circuit court is in a better position to decide an issue than an appellate court. The circuit court is closer to the evidence, sees and hears the witnesses, and decides more cases on the issue. The value of uniformity may be limited because no two fact situations are alike.[26] In those situations, deference to the trial court is appropriate.

---

[25] *Cook v. Chicago,* 192 F.3d 693, 697 (7th Cir. 1999).

[26] *Cook,* 192 F.3d at 697 ("That is, Judge X might have decided the same case differently from Judge Y, but since the same case is highly unlikely ever to recur, no conflict between X and Y is likely."); *Bergersen v. Comm'r of Internal Revenue,* 109 F.3d 56, 61 (1st Cir. 1997) ("[A] fact-finder closer to the evidence may still have a superior 'feel'; [but] the value of precedent is limited, since the next shake of the kaleidoscope will produce a different fact pattern."); *Trinity Evangelical Lutheran Church v. Tower Ins. Co.,* 2003 WI 46, ¶ 46, 261 Wis. 2d 333, 661 N.W.2d 789; *State v. Phillips,* 218 Wis. 2d 180, 194, 577 N.W.2d 794 (1998); *State v. Garfoot,* 207 Wis. 2d 214, 234–35, 558 N.W.2d 626 (1997) (Abrahamson, C.J., dissenting).

¶ 41. Although the question of reasonableness is a question of law, we do not adopt the independent standard of appellate review for the reasonableness of a parent's decision to forgo employment outside the home and become an at-home full-time child care provider. A decision on reasonableness in this context is closely intertwined with the facts. A circuit court is closer to the evidence, and a determination of child support is ordinarily within the discretion of the circuit court. If an appellate court were to independently decide the question of reasonableness in the present case, it might usurp the circuit court's role as fact finder and the circuit court's exercise of discretion.

¶ 42. In rejecting the independent standard of appellate review for evaluating the reasonableness of a parent's decision to forgo employment outside the home to become an at-home full-time child care provider, we do not adopt the erroneous exercise of discretion standard of appellate review. In shirking cases, a circuit court's ruling on reasonableness, a question of law, should be subject to more heightened appellate scrutiny than the highly deferential erroneous exercise of discretion standard of review. A level of deference between the two standards of appellate review—independent review and erroneous exercise of discretion—recognizes the appellate court's goal of reducing the risk of error on this question of law. And even though no two shirking cases are apt to be alike, this level of appellate review may help achieve a level of uniformity across cases, thereby guiding litigants and courts.[27]

_____

[27] Evan Tsen Lee, in the article *Principled Decision Making and the Proper Role of Federal Appellate Courts: The Mixed Questions Conflict*, 64 S. Cal. L. Rev. 235 (1990), has described the difficulty of determining the standard of appellate review of

¶ 43. Given these considerations, we adopt the *Van Offeren/Wassenaar* standard of appellate review for the reasonableness of a parent's decision to forgo or reduce income from employment outside the home. We adopt this standard because the legal question of reasonableness in a shirking case is a question of law (ordinarily suitable for independent appellate determination) that is intertwined with the facts (ordinarily suitable for appellate court deference to the circuit court). Concerns of judicial administration—efficiency, accuracy, and precedence—make this standard of appellate review appropriate.

## IV

¶ 44. With appropriate deference to the circuit court's ruling, we now determine the reasonableness of the mother's decision to forgo employment outside the home to become an at-home full-time child care provider.

---

the question whether the rule of law as applied to the established facts was violated as follows:

> Perhaps the conflict [about the standard of appellate review] is so difficult to resolve [in such a case] because, from the perspective of the appellate court, it seems to sit precisely at the midpoint between the Scylla of allowing errors to go uncorrected and the Charybdis of judicial inefficiency. Too much deference and the court fails to fulfill its duty to ensure that justice is done; not enough deference and it will be sucked into a whirlpool of unending review of fact patterns too peculiar to recur.

*Id.* at 236.

For a discussion of the concerns of judicial administration in determining the appropriate standard of review for a trial court's application of law to fact, see *United States v. McConney,* 728 F.2d 1195, 1200–05 (9th Cir. 1984).

¶ 45. While a family is intact, the parents' choice of employment, child care, and standard of living are left to the parties, as long as the children's basic needs are met. Upon divorce, however, courts are plunged into the divorced parents' personal lives to ensure that the interests of minor children are protected.

■■■■

¶ 46. A divorced parent who voluntarily leaves gainful employment outside the home, for however good a reason, may be subject to judicial inquiry into that parent's responsibility to furnish child support. A divorced parent may voluntarily terminate employment but may not do so if the conduct inures to the detriment of child support.[28] There is a limit to the unemployment or underemployment of a parent when the other parent "is presented the bill for the financial consequences."[29]

■■■■

¶ 47. When a divorced parent decides to forgo employment outside the home to render at-home full-time child care (but not for the purpose of avoiding a support obligation), the circuit court and the appellate courts must carefully analyze and weigh the significant conflicting interests in determining the reasonableness of the parent's decision. A court must weigh the right of a parent to make such a choice, while keeping in mind the public's interests that children be adequately cared for, that the financial needs of the children be met, and that the financial burdens of child care be apportioned fairly between the parents.

■■■■

¶ 48. If it determines that a parent's decision to forgo employment outside the home to provide at-home

---

[28] *Modrow,* 247 Wis. 2d 889, ¶ 21.

[29] *Sellers,* 201 Wis. 2d at 586.

full-time child care is unreasonable, a court can impose an obligation on that parent to support a child by imputing income to the parent based on that parent's earning capacity.

¶ 49. The dissent in the court of appeals in the present case advocates disfavoring a parent's decision to forgo employment outside the home to become an at-home full-time child care provider.[30] We do not adopt a position favoring or disfavoring a parent's decision to forgo employment outside the home to become an at-home full-time or part-time child care provider. The case at bar is not one in which the circuit court or this court makes a policy determination that it is in the best interests of children to have a parent be a full- or part-time at-home child care provider or have both parents be wage earners. The determination of the reasonableness of a parent's decision to forgo employment outside the home to provide full- or part-time at-home child care depends on several factors. We recognize, however, that there is no list of factors that automatically proves decisive in shirking determinations.[31]

¶ 50. The factors to be considered in determining the reasonableness of a parent's decision to forgo employment outside the home, become an at-home full-time child care provider, and increase the support obligation of the other parent include, but are not limited to, the following: the number of children at home and their ages, maturity, health, and special

---

[30] *Chen,* 274 Wis. 2d 443, ¶ 60 (Dykman, J., dissenting).

[31] *Wallen v. Wallen,* 139 Wis. 2d 217, 225, 407 N.W.2d 293 (Ct. App. 1987).

needs; the availability of child care providers; the financial needs of the children; any detrimental effect on the child's support level if a parent is a full- or part-time at-home child care provider; the age and mental and physical condition of the parents; the educational background, training, skills, prior employment, and wage earning history of each parent; the earning potential of the parent who forgoes employment outside the home and that parent's efforts to find and retain employment; the status of the job market; the assets and income of each parent and the available resources if a parent is an at-home full- or part-time child care provider; the hardship and burden on the parent employed outside the home caused by the other parent's decision to forgo employment; and any other factors bearing on the needs of the children and each parent's ability to fund child support.[32]

¶ 51. The gender of the parent forgoing employment outside the home to provide at-home full- or part-time child care is not a relevant factor.[33]

¶ 52. The record in the present case supports the circuit court's determination that the mother's initial decision to terminate employment was reasonable. At

---

[32] For discussions of these factors, see Lewis Becker, *Spousal and Child Support and the "Voluntary Reduction of Income" Doctrine,* 29 Conn. L. Rev. 647 (1997); Elizabeth Trainor, Annotation, *Basis for Imputing Income for Purpose of Determining Child Support Where Obligor Spouse is Voluntarily Unemployed or Underemployed,* 76 A.L.R. 5th 191 (2000).

[33] *Cf. Forester v. Forester,* 174 Wis. 2d 78, 88–89, 496 N.W.2d 771 (Ct. App. 1993) (wife's earning capacity as a surgical technician used to determine husband's maintenance obligation).

the time of her decision, the mother was advised by a professional financial advisor that she could expect investment income of about $110,000 per year, an amount sufficient to support herself and fund her share of the children's support. The children would get the same level of support; no additional financial burden would be placed on the father.

¶ 53. The question then becomes whether it was reasonable for the mother not to take full- or part-time employment as a physician when the income from her investments fell. It is this decision that precipitated the mother's child support motion and prompted the father's shirking allegation.

¶ 54. The circuit court properly recognized that shirking does not require a finding that a party's income reduction was done in bad faith or with improper motive.[34] Shirking can be found even when the party reducing his or her income acts with the best intentions. The father does not assert that the mother's decision to remain unemployed was motivated by anything other than the children's best interests.

¶ 55. The circuit court concluded, and we agree, that a parent's decision to provide at-home full-time child care may but does not, in and of itself, amount to shirking.[35] As the circuit court explained, if the father is

[34] *Roberts v. Roberts,* 173 Wis. 2d 406, 411, 496 N.W.2d 210 (Ct. App. 1992).

[35] In *Roberts,* 173 Wis. 2d at 411–12, a mother's decision to be an at-home full-time child care provider for a child of a second marriage was determined to be shirking; her support obligation to the children of a prior marriage was determined on the basis of her earning capacity, not on her actual earnings.

right that the mother's forgoing income from employment outside the home to become an at-home full-time child care provider is automatically unreasonable, then every arrangement in which one parent predominantly attends to the children while the other predominantly attends to an income-producing job is shirking. Furthermore, as the circuit court stated, under the father's theory it would no longer be appropriate to impute economic value to child care or homemaking services, as our statutes permit.[36]

¶ 56. The father agreed at trial that if a family unit "can do it," that is, if it is feasible, it is preferable for the children to be with a parent rather than with someone else and that it is preferable to have a parent available as a full-time at-home child care provider rather than have one parent or both parents as part-time at-home child care providers. The father's briefs now seem to assert that the children might have greater opportunities had their mother continued to earn her substantial salary.

¶ 57. The circuit court properly considered the benefits to the children resulting from the mother's decision not to be employed outside the home. The father does not dispute the mother's accounting of her child-related activities, nor does he argue that the children do not benefit from her greater involvement in

The court determined that it had to balance the interests of the children and the mother and concluded that the mother's election to forgo employment was detrimental to the support needs of her other children. No such detriment to the children exists in the instant case.

[36] Wis. Stat. § 767.255(3)(d) (in property division a circuit court may consider the contribution of each party to the marriage, giving appropriate economic value to each party's contribution in homemaking and child care services).

371

their lives. Rather, he argues that the benefits are not so great as to render reasonable her decision not to be employed outside the home in the face of her dwindling and inadequate investment returns. The father argues, and the mother does not dispute, that the children were doing well when both parents worked full time outside the home and that the children have no special needs or disabilities. Further, the father points out that the mother worked full time before the children were of school age and now stays home full time while they are in school. The usual practice, he contends, is for a parent to stay home while the children are very young and return to work when they start school.

¶ 58. The father makes good points, but we conclude, as did the circuit court, that the benefits to the children in the present case are a factor to be weighed in favor of the mother's decision not to be employed outside the home.[37] This factor favoring the mother is not, however, determinative of the case.

¶ 59. This case presents the issue of whether it is fair to the father and to the children, in light of the mother's legal obligation to support the children, for a court not to impute to the mother her earning capacity, thereby increasing the father's child support obligations.

¶ 60. The father's key point is that the reasonableness of the mother's decision to be an at-home

---

[37] Wisconsin Stat. § 767.25(1m)(d) provides that in modifying the amount of child support from the percentage standard, a circuit court must consider the desirability of the custodian's remaining at home as a full-time parent.

The court in no way suggests that dual-income families are somehow providing less of a benefit for their children or are otherwise doing their children an injustice.

full-time child care provider should not be based solely on the fact that the father can afford to pay child support. We agree with the father. The father's ability to pay was not the circuit court's sole basis, nor is it our sole basis, for determining the reasonableness of the mother's decision. The father's ability to make increased expenditures for the children is but one factor to be weighed in determining whether it was reasonable for the mother to forgo employment outside the home to become an at-home full-time child care provider. Ability to pay and the effect of a support obligation on the obligor parent's finances are always important considerations in determining child support.[38]

¶ 61. Certainly, if a working parent's income were low, that factor would weigh against a finding that the other parent's decision to forgo employment outside the home was reasonable. The converse should also be true.

¶ 62. In the present case the father's ability to make increased expenditures for the children is unusually high. As a result, the effect of increased support of $2,800 on the father's standard of living and financial picture is negligible. The father had monthly discretionary income of $12,000, over and above his monthly expenses and retirement savings. He could pay the court-ordered increased child support of $2,800 a month without any significant impact on his finances. Unlike the dissent in the court of appeals in the present

---

[38] *See* Wis. Stat. § 767.25(1m)(b) (in modifying the amount of child support from the percentage standard, a circuit court considers "[t]he financial resources of both parents"); § 767.25(1m)(bp) (in modifying the amount of child support from the percentage standard, a circuit court considers "[t]he needs of each party in order to support himself or herself at a level equal to or greater than [the federal poverty level].").

case, we would not require the mother to liquidate her assets before requiring the father to increase child support obligations that he can easily meet from his annual income.[39]

¶ 63. The father makes several other arguments challenging the circuit court's order. First, he asserts that a decision favoring the mother would be inconsistent with the *Sellers* and *Van Offeren* cases. The father claims that the circumstances in those cases, in which a parent was determined to be shirking, were less extreme than those surrounding the mother's decision in the present case. We disagree with the father.

¶ 64. In *Sellers*,[40] Jane and Kelly Sellers were married for 14 years and had two minor children at the time of divorce. The parties shared physical placement. The circuit court calculated child support on the basis of the husband's earning capacity because his job choice was unreasonable under the circumstances.[41] The court of appeals affirmed. The husband had been a laborer at a paper mill, earning $25,000 to $30,000 per year, and several years before the divorce he had changed to a job in which he earned $13,000 to $17,000 per year.

¶ 65. *Sellers* is unlike the present case. In *Sellers,* after the divorce, the wife, the higher wage earner, did not have sufficient income to provide an appropriate standard of living for the family. Accordingly, although giving some deference to the husband's preferred employment, the circuit court concluded that the husband's continued employment at the lower-paid job

---

[39] *Chen,* 274 Wis. 2d 443, ¶¶ 61–62.

[40] *Sellers v. Sellers,* 201 Wis. 2d 578, 549 N.W.2d 481 (Ct. App. 1996).

[41] *Id.* at 588.

was unreasonable and that the husband's earning capacity would be used in determining child support obligations.

¶ 66. In *Van Offeren*,[42] William Van Offeren left his employment to start a business that would, he hoped, secure greater income in five to six years. The husband knew that the projected earnings from the new business would be zero the first year and that the children would be adults before the business brought in income sufficient for child support. The circuit court held (and the court of appeals agreed) that as a child support obligor, he should have first secured a "comparable" source of income before leaving a job with a lucrative salary.[43] The circuit court refused to reduce the husband's support obligations.

¶ 67. The father asserts that the mother, like William Van Offeren, took a risk, relying on the risky stock market to yield a future income stream that was not comparable to her past employment earnings. Her potential earnings as a physician were four times her projected investment income.

¶ 68. The facts of *Van Offeren* are different from those in the present case. The mother here was not reducing her income to zero; the mother's plan anticipated substantial income for child support. Moreover, William Van Offeren's child support payments were essential to support the children; his failure to pay child support forced his former wife to depend on contributions from friends, relatives, the church, and federal and state assistance to provide for the children.[44]

---

[42] *Van Offeren v. Van Offeren*, 173 Wis. 2d 482, 496 N.W.2d 660 (Ct. App. 1992).

[43] *Id.* at 497.

[44] *Id.* at 490.

¶ 69. We conclude that the holding in the present case is consistent with the *Sellers* and *Van Offeren* cases.

¶ 70. Second, for the first time, the father argues that the children will suffer by the mother's decision to forgo paid employment outside the home. He argues that the court has terminated the father's obligation to contribute to the trust accounts for the children's post-high school education, thereby effectively forcing the children to subsidize their mother's early retirement and diminishing the children's funds for post-high school education. We disagree with the father. The mother's decision to forgo employment outside the home to become an at-home full-time child care provider was reasonable considering the present interests of the children and the other factors present in the case at bar. Further, nothing prevents the father from voluntarily continuing to pay $1,200 per month toward the children's education fund.

¶ 71. Third, the father contends that if the mother's decision to forgo employment outside the home to become an at-home full-time child care provider is held to be reasonable, such a decision is poor public policy in that it encourages high-income parents to race to early retirement or to resign their positions. We are not persuaded by this argument. Retiring or resigning is not a decision made easily. A person who has devoted a significant amount of time and effort in building a career does not readily relinquish job satisfaction, income, lifestyle, retirement security, and status. The mother testified that leaving her job was a very difficult decision for her, as it most likely would be for anyone with the training and income level both parents have been able to achieve.

¶ 72. Fourth and finally, the father argues that if the mother's decision to forgo employment outside the home to become an at-home full-time child care provider is held to be reasonable, this court would create uncertainty in the law of shirking by implying that a different analysis applies to high-income families and low-income families. This argument seems to be based on the circuit court's considering the father's high income as a factor that weighs in favor of a finding that the mother's decision is reasonable.

¶ 73. This concern is unfounded. No court—not the circuit court, not the court of appeals, and not this court—has created a separate shirking analysis for high-income families. The same rule is applied in each case: reasonableness under the circumstances. Reasonableness is a fact-dependent (as well as legal) decision. The circuit court must determine the reasonableness of the alleged shirker's reduction in income based on all the circumstances of the parties, including the income and ability to pay of the parent from whom child support is sought.

¶ 74. Financial status is always important in determining child support obligations. A high-income parent may have different financial obligations than a parent of more modest means. For example, Wisconsin Administrative Code ch. DWD 40, which defines the percentage-of-income standards to be used in awarding child support, sets forth a reduced percentage standard that the court may use for high-income payers.[45] Further, cases have held that it is proper to deviate from the percentage standards in high-income family situations.

---

[45] *See* Wis. Admin. Code § DWD 40.04(5) (Dec., 2003).

¶ 75. In *Ayres v. Ayres,* 230 Wis. 2d 431, 602 N.W.2d 132 (Ct. App. 1999), the court of appeals held that the circuit court had properly deviated from the percentage standard when application of the standard to a high-income parent would have resulted in a child support award of $130,000 per year.[46] Such a large award would far exceed the amount needed to support the children at the standard of living they would have enjoyed had the parties remained married.[47]

¶ 76. We must have "one rule for rich and poor, for the favourite at court and the countryman at plough,"[48] and the father is correct in pressing this point. Nevertheless, the application of a single rule to all persons may yield different consequences for each person. If it did not, a circuit court would not, in determining child support, be required to examine the circumstances of each case. Anatole France best expressed in a single sentence the myth of absolute equality in law, writing of "the majestic equality of the laws, which forbid rich and poor alike to sleep under bridges, to beg in the street, and to steal their bread."[49]

¶ 77. Giving appropriate deference to the circuit court and examining the issue of reasonableness under the circumstances independently as a question of law, we conclude that the circuit court correctly concluded that the mother's decision to remain unemployed to be

---

[46] *Ayres,* 230 Wis. 2d at 433.

[47] *Id.* at 433–34.

[48] John Locke, *Two Treatises of Government* 194 (Thomas I. Cook ed., Hafner Publ'g Co. 1947) (1690) (quoting *The Second Treatise of Civil Government,* ch. XI, ¶ 142).

[49] Anatole France, *The Red Lily* 91 (Frederic Chapman ed., Winfred Stephens trans., Dodd, Mead & Co. 1925).

an at-home full-time child care provider was reasonable under the circumstances, given the parents' agreement that, if feasible, it was better for the children to have a parent at home full time than to have both parents working full time or part time outside the home; the benefit to the children in the instant case of having an at-home full-time child care provider; the mother's inability to find part-time employment within commuting distance of the home; and the father's ability to make the additional expenditures for the children without an impact on his standard of living or his short-term or long-term financial health.

¶ 78. We do not set forth a general rule that it is always reasonable for a parent to terminate employment to become an at-home full-time child care provider when the other parent has the ability to support the children. We merely conclude that, under the facts of this case, as a matter of law, and giving deference to the circuit court's ruling, the mother's decision to forgo employment outside the home to become an at-home full-time child care provider was reasonable and that the circuit court correctly concluded that the mother was not shirking her obligation to support the children.

\* \* \* \*

¶ 79. In sum, we conclude that the proper standard of appellate review of a circuit court's determination of reasonableness in a child support shirking case is that an appellate court should independently determine the issue of reasonableness, giving appropriate deference to the circuit court. We conclude that in the present case, under the particular circumstances of the parties, the circuit court properly concluded that it was reasonable for the mother to forgo employment outside

379

the home and become an at-home full-time child care provider. We affirm the court of appeals' decision affirming the circuit court's order that the father pay $4,000 per month to the mother as child support.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 80. JON P. WILCOX, J. (*dissenting*). Although I agree with much of Justice Butler's dissent, I write separately to expand upon the deficiencies in the majority's shirking analysis. First, I do not believe that an ex-spouse's income is an appropriate consideration when determining whether the other parent is shirking. *Cf.* Majority op., ¶ 60. As noted by Justice Butler, the proper test for shirking is whether the parent's voluntary decision to reduce income is reasonable in light of that person's legal obligation to provide financial support to his or her children. Justice Butler's dissent, ¶¶ 106–08.

¶ 81. As each parent has an independent obligation to provide financial support for his or her children, *see Rottscheit v. Dumler,* 2003 WI 62, ¶ 31, 262 Wis. 2d 292, 664 N.W.2d 525, one parent's voluntary decision to forego income should not be rendered reasonable merely because the other parent has the financial ability to make up the difference. The focus of a shirking analysis is not on the other parent's earning capacity but on the reasonableness of the alleged shirker's decision in light of his or her obligation to financially support the children: "Shirking is established where the obligor intentionally avoids the duty to support or where the obligor *unreasonably diminishes or terminates his or her income in light of the support obligation." Van Offeren v. Van Offeren,* 173 Wis. 2d 482, 492, 496 N.W.2d 660 (Ct. App. 1992)(emphasis added).

The decision to voluntarily forgo income is thus "*subject to reasonableness commensurate with his [or her] obligations to his children . . . . Id.* at 495 (quoting *Balaam v. Balaam,* 52 Wis. 2d 20, 28, 187 N.W.2d 867 (1971)).

¶ 82. I also disagree with the majority that a parent's subjective belief as to what is in his or her children's best interest plays any role in determining the reasonableness of his or her decision to voluntarily forgo income. *Cf.* majority op., ¶ 56. The circuit court's decision as to the amount of child support owed represents the determination as to what level of financial support is in the children's best interest. *Doerr v. Doerr,* 189 Wis. 2d 112, 128–29, 525 N.W.2d 745 (Ct. App. 1994). Reasonableness of a decision to forgo income is determined "*in light of the support obligation.*" *Van Offeren,* 173 Wis. 2d at 492 (emphasis added).

¶ 83. Moreover, while a decision to completely forgo income may be deemed reasonable if such a decision represents a long-term, prudent career move and is likely to substantially increase the parent's earning capacity, the fact that such a decision is not related to any desire to increase future earning capacity reflects its unreasonableness. *Doerr,* 189 Wis. 2d at 130–32; *Van Offeren,* 173 Wis. 2d at 498. As Justice Butler correctly indicates, Dr. Chen's decision to forego income in this case was not related to any desire to increase her earning capacity; indeed, she plans on returning to her previous line of work once her children are adults (by which time her legal obligation to financially support them will end). Justice Butler's dissent, ¶¶ 93–94.

¶ 84. That Dr. Chen desires to spend more time with her children is certainly laudable; however, her decision to be more involved in her children's lives should not relieve her of her legal obligation to finan-

cially support them. Given that Dr. Chen's decision to forgo employment was not related to a desire to increase her earning capacity, I would conclude that her decision to "retire" early to spend more time with her children was reasonable so long as she was able to meet her child support obligations. While she initially was able to meet her legal obligation to financially support her children through investment income, that is no longer the case.[1] Dr. Chen's decision to remain unemployed while unable or unwilling[2] to independently fulfill her legal obligation to financially support her children and her attempt to force Dr. Warner to finance her early retirement are objectively unreasonable under the facts of this case.

¶ 85. Finally, I wish to emphasize that contrary to the majority's assertion, majority op., ¶ 49, concluding that Dr. Chen's decision to remain unemployed is unreasonable is not tantamount to adopting a rule disfavoring a parent's decision to stay at home with his or her children. Rather, it is merely a reaffirmation of the principle that divorced parents retain the freedom to pursue a career of their choosing, so long as that decision is reasonable in light of their legal obligation to financially support their children. *Van Offeren,* 173 Wis. 2d at 496–97. Dr. Chen has every right to stay at home

---

[1] *See Sellers v. Sellers,* 201 Wis. 2d 578, 588, 549 N.W.2d 481 (Ct. App. 1996)("Because Kelly was not required to maximize his earning capacity, he enjoyed the luxury of pursuing private interests without regard to compensation. That situation no longer exists.").

[2] I agree with Judge Dykman that Dr. Chen's refusal to invade her $1,691,000 estate to support her children should be considered in assessing whether her decision to remain unemployed is reasonable. *Chen v. Warner,* 2004 WI App 112, ¶ 62, 274 Wis. 2d 443, 683 N.W.2d 468 (Dykman, J., dissenting).

with her children. However, the law should not force her former spouse to finance that decision if she is unable to meet her legal obligations to provide financial support for her children.

¶ 86. I would conclude that Dr. Chen's decision to remain unemployed in light of her decreased investment income and legal obligation to financially support her children constitutes shirking and would therefore reverse the decision of the court of appeals. Accordingly, I dissent.

¶ 87. LOUIS B. BUTLER, JR., J. (*dissenting*). The majority concludes that Jane E. Chen's (the mother's) decision to reduce or forego income was reasonable and did not constitute shirking in the context of a modification of the child support portion of a divorce judgment that required John J. Warner (the father) to pay $4,000 per month in child support. I agree with the majority that the proper standard of review normally requires an appellate court to independently review reasonableness, while giving appropriate deference to the trial court. Majority op., ¶ 3.

¶ 88. However, because the circuit court misapplied the shirking analysis, no deference is warranted in this matter. In addition, because the majority merely pays lip service to the proper standard for shirking, I would reverse the court of appeals decision[1] and remand the matter to the circuit court for a determination of whether the mother's employment decision is unreasonable "in light of her child support obligations." I therefore respectfully dissent.

---

[1] *Chen v. Warner*, 2004 WI App 112, 274 Wis. 2d 443, 683 N.W.2d 468.

## I

¶ 89. The mother and father, who are both millionaires, divorced in 1999. The divorce judgment, which incorporated their marital settlement agreement, provided for joint custody and equal physical placement. The judgment provided that neither would pay child support and that each parent would be responsible for the children's daily expenses when the children were with that parent. Other than an education fund the father contributed to each month, expenses were to be equally divided.

¶ 90. At the time of the divorce, both parents were employed as physicians at the Marshfield Clinic. The mother, a clinical anesthesiologist and administrative physician, earned $236,000 per year, while the father, a neuroradiologist, earned $256,452 per year. The mother worked on average in excess of 60 hours per week, which included her on-call requirements.

¶ 91. Although the children were doing extremely well before, up to and after the divorce, the mother testified at the child support modification hearing that she felt that the children were not seeing either herself or their father enough and were being raised by surrogates.[2] This, the mother felt, was not fair to the children. When asked if she perceived the children were experiencing any "stresses or changes" during the divorce, the mother did not respond, except to say that she attended courses on what kind of effects divorce has on children. She did state, however, that she determined it was more desirable to be available for her children on a more regular basis. When asked if the medical literature supported "whether or not it's desir-

---

[2] The mother also agreed that the children do not have special needs.

able to have a parent available for a child," the father stipulated that it's in the children's best interests to have regular supervision provided by their parents, when possible.

¶ 92. Shortly after filing for divorce in the summer of 1998, the mother asked Marshfield Clinic to reduce her work schedule to part-time. Apparently, the clinic delayed answering her request.

¶ 93. During 1999, the first year after the divorce was finalized, the mother noted that given the equal placement agreement she was seeing the children half the time. In addition, she stated that she had not made it to any of her preschooler's or kindergartener's events and had only made it to one of her first grader's field trips. She said the children were extremely disappointed at her absences. When the children asked why she was not in attendance, the mother said she did not have a good answer for being at work.

¶ 94. In 2000, the mother pressed Marshfield Clinic for an answer regarding part-time employment, accusing the clinic of not supporting family values. After the clinic made clear it could not offer her part-time employment, the mother decided her children's needs took precedence over her personal career goals. Because her children "weren't going to be young forever" and needed somebody to be there for them, she retired in May 2000 at the age of 43. She testified that she thought she had no alternatives within her profession to continue working and still have more time for her children. Once her children are "launched," however, she plans on returning to work.

¶ 95. During retirement, the mother is now very involved with the children's lives. She stated she is extremely active in the children's school activities: she volunteers in each of their classrooms and has partici-

pated in nearly all the class field trips as a driver or chaperone. She is also very involved with the children's social activities. She takes them to all their lessons, and she carefully monitors the children's friends and families.

¶ 96. Before retiring, the mother consulted with a financial advisor. Based on her savings of $1.1 million, the financial advisor told her that she could anticipate an annual interest income of $110,000. As her budget was $84,000 per year, she did not seek child support from the father at that time.

¶ 97. In 2001, due to a decline in the stock market, the mother earned only $32,000. During that time, she spoke to a recruiter at Marshfield Clinic about part-time employment. Although there were no current positions available, the mother submitted an application should there be any openings. She testified she also spoke with a "locum tenens company," the medical profession's equivalent of a temporary employment agency, but no part-time positions were available within a reasonable commuting distance. Although she almost secured part-time employment in March 2002 at a hospital in Eau Claire when she was fortuitously there for her significant other's surgery,[3] those arrangements fell through.

¶ 98. Thus, all told, the mother submitted two applications for part-time employment: one at Marshfield Clinic and another at a hospital in Eau Claire. The

---

[3] As an aside, the mother also conceded that she lives with this significant other. This person is also not employed and has 50–50 placement of his two teenage children, though he spends most of his time with the children at his lake house. During 2001, this significant other had taxable income of roughly $5,000. The mother stated she had no idea how the significant other made ends meet.

mother also admitted that despite living in Marshfield, she did not look for part-time employment in Wausau, Neillsville, Wisconsin Rapids, or Stevens Point. In addition, she conceded that she did not file any applications with the locum tenens companies for part-time employment, because, apparently, they first require an opening before they accept applications. Regardless, the mother asserted that she could make $108,000 per year if she worked part-time.

¶ 99. In 2002, after failing to find a part-time job close to home and after using some of her savings, the mother filed a motion to amend the divorce judgment, seeking child support from the father. He was then earning $472,000 per year, with assets of over $1.2 million and his employer contributing to a retirement plan.

¶ 100. The mother requested $4,000 per month in child support based on her monthly budget of $7,000. The father argued that the mother's termination of employment in 2000 and her refusal to seek part-time work were unreasonable and amounted to shirking her obligation to support their children.

¶ 101. The circuit court agreed with the mother, and ordered the father to pay child support in the amount of $4,000 per month. The circuit court concluded that "even if [the mother] became completely unable to provide financial support for the minor children of the parties, even if [the mother] were shirking, it would not follow that the children would not be entitled to [the father's] support." The court proceeded to find that the mother's retirement did not constitute shirking.

¶ 102. The court noted that when the mother retired, there was no concern about support money given her financial adviser's advice. That the market fell, the court concluded, did not transform the mother's

benevolent decision to retire into malevolent shirking. The court observed that the mother attempted to find part-time employment, but was unsuccessful. The court then turned attention to the father. Noting that the father's income has doubled since the divorce, the court found that Warner could afford to pay the $4,000 child support the mother sought.

¶ 103. In setting the amount, the court did not excuse the father from contributing $1,200 to the children's education funds. Because child support was imposed, the marital settlement agreement provided that the father's obligation to pay into the fund was rendered null and void.

## II

¶ 104. The general rule regarding the level of child support is that it "must be established according to the needs of the custodial parent and children and the ability of the noncustodial parent to pay." *Roellig v. Roellig,* 146 Wis. 2d 652, 657, 431 N.W.2d 759 (Ct. App. 1988). However, this general rule is subject to a "shirking" exception. If a parent is shirking, courts will refuse to modify child support obligations based on the parent's actual earnings and will instead look to that parent's earning capacity. *Voecks v. Voecks,* 171 Wis. 2d 184, 188, 491 N.W.2d 107 (Ct. App. 1992). While shirking usually arises to disadvantage a payor, it applies equally to a payee, or in this joint custody case, to one who seeks to become a payee. *See Finley v. Finley,* 2002 WI App 144, ¶¶ 12–13, 256 Wis. 2d 508, 648 N.W.2d 536.

## A

¶ 105. The proper articulation and application of the standard for determining if a parent is shirking has been lost in this case. Citing *Sellers v. Sellers,* 201 Wis. 2d 578, 549 N.W.2d 481 (Ct. App. 1996), the circuit court

determined that shirking "requires a showing of a person's voluntary[4] and unreasonable employment decision." The court of appeals in *Sellers* did indeed use that terminology in describing shirking. *Id.* at 587. It indicated that shirking occurs where a court finds "the employment decision both voluntary and unreasonable under the circumstances." *Id.* at 587 (citing *Van Offeren v. Van Offeren,* 173 Wis. 2d 482, 496 N.W.2d 660 (Ct. App. 1992)). The majority has accepted the "unreasonable under the circumstances" terminology as the appropriate shirking test. Majority op., ¶¶ 22–27. Unfortunately, that language from *Sellers* misstates the correct test, and has apparently taken on a life of its own.

¶ 106. As the court of appeals stated in *Van Offeren,* 173 Wis. 2d at 496, shirking normally implies a finding of intent to avoid support obligations. When a voluntary reduction in income is well-intended, however, it is proper "to assess the reasonableness of that decision *in light of the person's support or maintenance obligations." Id.* (emphasis added). *Accord, Kelly v. Hougham,* 178 Wis. 2d 546, 555, 504 N.W.2d 440 (Ct. App. 1993), *Smith v. Smith,* 177 Wis. 2d 128, 136, 501 N.W.2d 850 (Ct. App. 1993); *In re R.L.M.,* 143 Wis. 2d 849, 853, 422 N.W.2d 890 (Ct. App. 1988). Indeed, our court has indicated that whether a person decides to reduce one's income is subject to reasonableness commensurate with one's support obligations to both children and former spouse. *Balaam v. Balaam,* 52 Wis. 2d 20, 28, 187 N.W.2d 867 (1971). The court of appeals in *Van Offeren* did not interpret reasonableness with the cosmic focus of what is reasonable "under the circumstances."

---

[4] It is undisputed that the mother voluntarily retired from Marshfield Clinic.

¶ 107. The test's focus is much narrower. It is the mother who bears the burden of proving the reasonableness of her reduction in income commensurate with her child support obligations. *See Kelly,* 178 Wis. 2d at 556; *Smith,* 177 Wis. 2d at 134. Contrary to the majority's assertion, "commensurate with a spouse's obligations to the children" does refer to obligations of financial support. *See* majority op., ¶ 23. Shirking is established where the obligor intentionally avoids the duty to support or unreasonably terminates his or her income in light of the support obligation. *Compare* majority op., ¶ 23, *with Van Offeren,* 173 Wis. 2d at 492. And child support is "designed to maintain children, insofar as possible, at the *economic level* they would have enjoyed had there been no divorce." *See Sommer v. Sommer,* 108 Wis. 2d 586, 590, 323 N.W. 2d 144 (Ct. App. 1982) (emphasis added). Thus, the whole purpose of the shirking analysis is to inquire whether a parent is reasonably fulfilling his or her financial support obligations. In this case, the shirking analysis must focus on the mother's financial circumstances, as she unilaterally terminated her employment, which later impacted her ability to provide support for her children in the manner required by the divorce judgment.[5]

¶ 108. A well-intended voluntary change in financial circumstances that nonetheless provides a sufficient income to meet one's child support obligations may not be unreasonable at that particular time. But

---

[5] Even using the proper test, "[t]here is no set list of factors which are decisive in a shirking determination." *Wallen v. Wallen,* 139 Wis. 2d 217, 225, 407 N.W.2d 293 (Ct. App. 1987). The most common factor associated with a finding of shirking is a voluntary or self-inflicted change in financial circumstances, such as quitting employment, rejecting job offers, or retiring early. *Id.* at 226.

just as well-intended employment decisions may be unreasonable, *Sellers,* 201 Wis. 2d at 587, a well-intended reasonable decision can become unreasonable. And when that happens, it is up to that parent to then take reasonable steps to remedy the situation, commensurate with his or her child support obligations. Just like the father, the mother also has a legal obligation to meet her child support obligations. *See Rottscheit v. Dumler,* 2003 WI 62, ¶ 31, 262 Wis. 2d 292, 664 N.W.2d 525; *and Van Offeren,* 173 Wis. 2d at 497.

¶ 109. Certainly, the mother has the right to make career decisions that will diminish the income available for support. *See Van Offeren,* 173 Wis. 2d at 498. However, that right "is qualified—not absolute." *Id.* "[T]here must be some limit to the degree of underemployment one may elect to choose when the former spouse is being presented the bill for the financial consequences of the choice." *Sellers,* 201 Wis. 2d at 586. The same can be said of voluntary unemployment. Although the interests of the children of divorced parents are at the heart of the child support system, "parents have cognizable interests too." *Cameron v. Cameron,* 209 Wis. 2d 88, 108, 562 N.W.2d 126 (1997).

## B

¶ 110. This is a difficult case, but it requires remand because the circuit court did not properly consider whether the mother's continued unemployment, not initial retirement, is reasonable in light of her child support obligations.[6] The circuit court's con-

---

[6] Although not entirely clear, the circuit court seemed to conclude that even if the mother was shirking, she could still seek child support from the father. The circuit court stated that "even if [the mother] became completely unable to provide

clusion that the mother was not shirking boils down to the following: (1) her homemaking services are valuable; (2) she expected sufficient income; (3) the father has sufficient income.[7] These points miss the mark on whether the mother was shirking after the stock market declined.

¶ 111. As explained above, the shirking analysis focuses on whether the mother's earning capacity will be attributed to her as a result of her employment decisions in light of her child support obligations. *Compare R.L.M.*, 143 Wis. 2d at 853–54 (working part-time to obtain college degree, although advantageous to increasing earning capacity and eventual ability to support child, deprives child of support to which child is entitled), with *Kelly*, 178 Wis. 2d at 556–58 (temporarily reducing income by leaving well-paying job to pursue postgraduate education was reasonable because future earning capacity may benefit children in financial and intangible ways). Concluding that her full-time parenting care skills are valuable may certainly be a factor in whether the mother's employment decision was reasonable in light of her financial child support obligations, but it should not come first or necessarily be a deter-

---

financial support for the minor children of the parties, even if [the mother] were shirking, it would not follow that the children would not be entitled to [the father's] support." While it is true that the mother may (or may not) be entitled to support, the whole point of the shirking analysis is to impute earning capacity in order to determine the appropriate level of support.

[7] The majority affirms the order on essentially the same grounds, despite advancing an extensive, non-exhaustive list of factors that should be considered. Majority op., ¶ 50. These grounds do not take into account the mother's obligation to financially support her children.

mining factor. The court cannot simply ignore the mother's financial obligation to support her children.

¶ 112. The circuit court's second point is relevant only as it relates to the mother's initial decision to terminate her employment. It is irrelevant as to her conduct subsequent to the market decline. Once her investments did not return the expected income, the analysis should focus on what she did afterwards. The record indicates she submitted just two applications for part-time work, one of which was at Marshfield Clinic. However, she has not looked for part-time employment in many of Marshfield's surrounding communities, including Wausau, Neillsville, Wisconsin Rapids, or Stevens Point. Although the locum tenens company indicated that there is work in Milwaukee or LaCrosse, the mother testified that those locations were not within a reasonable commuting distance. In any case, the mother has not submitted any applications for part-time work through the locum tenens company. The trial court did not consider the mother's actions, except to say that she looked for part-time employment. That is true, as far as it goes. However, the court should gauge her employability. *See Wallen,* 139 Wis. 2d at 227. If she is employable, then by the mother's own testimony she could be earning $108,000 per year at a part-time job.

¶ 113. The circuit court's third point must also be viewed with deliberative caution. *See Forester v. Forester,* 174 Wis. 2d 78, 496 N.W.2d 771 (Ct. App. 1993) (holding ex-spouse should not be allowed to make a career choice that involves a substantial reduction in her earning capacity and simultaneously insist that her former spouse maintain her at her accustomed stan-

dard of living).[8] But as far as the third point is appropriate, it cuts both ways. While the father's income has doubled since the divorce, the record indicates that had the mother continued to work, her income would have doubled too. Aside from that, the circuit court also did not consider that the mother has sufficient assets to financially support her children. These are all factual circumstances the trial court should have considered.

¶ 114. The majority carefully adopts the *Van Offeren/Wassenaar*[9] standard of appellate review in shirking cases. Majority op., Part II. While I agree that this is the appropriate standard of review, we cannot give "appropriate" deference to the circuit court determination if that determination is based on an incorrect legal standard. Under the *Van Offeren/Wassenaar* standard, therefore, appropriate deference here is no deference at all. We are thus left with the options of either conducting a review de novo or remanding this matter to the trial court for further proceedings. *See Cameron,* 209 Wis. 2d at 99 ("When there is a failure to make findings of fact, we may affirm the judgment if it is clearly supported by a preponderance of the evidence, reverse the judgment if it is not so supported, or remand for the making of findings and conclusions."). Since the question of reasonableness is a question of law that is extensively intertwined with factual conclu-

---

[8] Although *Forester v. Forester,* 174 Wis. 2d 78, 496 N.W.2d 771 (Ct. App. 1993), dealt with maintenance, it has been cited with approval in child support cases. *See Smith v. Smith,* 177 Wis. 2d 128, 138, 501 N.W.2d 850 (Ct. App. 1993); and *Sellers v. Sellers,* 201 Wis. 2d 578, 586–87, 549 N.W.2d 481 (Ct. App. 1996).

[9] *See Van Offeren v. Van Offeren,* 173 Wis. 2d 482, 492–93, 496 N.W.2d 660 (Ct. App. 1992), and *Wassenaar v. Panos,* 111 Wis. 2d 518, 525, 331 N.W.2d 357 (1983).

sions, unlike the majority, I would opt for remand, as a de novo review would necessarily require us to make both factual and legal conclusions. *See Kenyon v. Kenyon,* 2004 WI 147, ¶¶ 36, 39–40, 277 Wis. 2d 47, 690 N.W.2d 251 (remanding maintenance modification to circuit court for consideration in light of new maintenance modification test. "[I]t is clear that the circuit court proceeded under an incorrect standard of law, and we simply do not know how the circuit court would have determined the matter had it applied the correct standard. . ."). *Id.,* ¶ 36.

### III

¶ 115. In sum, each parent has a duty to support his or her children. *Rottscheit,* 262 Wis. 2d 292, ¶ 31. That duty is continuous and ever evolving. In light of unforeseen circumstances, parents must act reasonably. But reasonableness is not assessed in a vacuum. The reasonableness of the mother's voluntary decision to terminate employment and her refusal to accept or seek meaningful employment after the stock market declined must be assessed in light of her obligation to support the children. Neither the circuit court nor the majority determined that her decision was reasonable in view of her obligation to provide financial support pursuant to the original judgment of divorce. Because the circuit court failed to apply the correct legal standard in this matter we cannot give any deference to the trial court's conclusions. Accordingly, I would remand this case to the circuit court to apply the correct standard.

¶ 116. For the foregoing reasons, I respectfully dissent.