IN RE the MARRIAGE OF:

DeAnn A. BECKER, Petitioner-Respondent,

v.

Michael D. BECKER, Respondent-Appellant.†

Court of Appeals

*No. 2013AP1481. Submitted on briefs March 7, 2014.
—Decided June 19, 2014.*

2014 WI App 76

(Also reported in 851 N.W.2d 816.)

† Petition for Review denied October 6, 2014.

530

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Thomas W. St. John* and *Joseph M. Peltz* of *Friebert, Finerty & St. John, S.C.,* Milwaukee.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Bruce M. Peckerman* and *Jennifer J. Van Kirk* of *Peckerman, Klein & Van Kirk,* Milwaukee.

Before Blanchard, P.J., Sherman and Kloppenburg, JJ.

¶ 1. KLOPPENBURG, J. In this post-divorce judgment action, Michael Becker appeals circuit court orders setting child support, awarding attorney's fees to DeAnn Becker, and finding Michael in contempt for not making child support payments. Michael contends that the circuit court erred in determining child support by imputing income to Michael based on his earning capacity as a cardiologist rather than by relying on his self-reported lack of income from his current cardiology practice, and that the court consequently erred in finding him in contempt for nonpayment of child support and in requiring that he pay DeAnn's attorney's fees. We conclude that the court followed the correct legal standard in setting child support by imputing income to Michael based on his earning capacity as a cardiologist, and that the evidence sufficiently supports the circuit court's determination that Michael's "deci-

sion . . . to operate the profitless business [was] voluntarily done and unreasonable." Accordingly, we affirm.

## BACKGROUND

¶ 2. The following facts are taken from evidence presented at an October 24, 2012 hearing at which DeAnn and Michael testified. DeAnn and Michael were married in 1988 and divorced in 2003, with four children then under eighteen. At the time of divorce, Michael was a cardiologist with his own practice and an annual income of $558,000, and DeAnn was a stay-at-home mother. During the marriage DeAnn worked as Michael's office manager and "took care of everything administratively." Michael and DeAnn stipulated to indefinite family support in the amount of fifty-five percent of the first $400,000 of Michael's income, forty-five percent of the next $200,000 of his income, and fifty percent of his income over $600,000.

¶ 3. After the divorce, Michael joined a larger cardiac practice, which was ultimately acquired by Aurora Medical Group, Inc. In September 2009, Aurora terminated Michael's employment and subsequently paid him three months of severance pay. Michael stopped paying family support in February 2010, when he stopped earning income. Since February 2010, DeAnn returned to work as a nurse earning approximately $36,000 a year. Michael "look[ed] into positions" at the three large Milwaukee hospitals other than Aurora, but none had cardiologist positions open to him. Other than being employed by one of those three Milwaukee hospitals or starting his own practice, "[t]he only reasonable alternatives available were out of town alternatives, out of state alternatives," but Michael did not seek employment opportunities outside of Milwaukee.

¶ 4.   In June 2010, Michael purchased the practice of a cardiologist who had recently died. Michael expected when he purchased the practice that it would take from two to five years to become profitable and that it would be difficult to bring in new patients, in part because of a lack of referrals to cardiologists, like him, outside of the hospital network; in addition, he had throughout his career experienced problems with the management side of running a medical practice. After he purchased the practice, payments by Medicare, which covered most of his patients, shrank significantly. Between June 2010 and October 2012, Michael invested over $200,000, including $167,000 of his savings, into his practice. In September 2012 he for the first time reported income of $1,713 from the practice, which had until then been operating in the red. Between June 2010 and October 2012, Michael also "[became] involved in" two other start-up businesses. As of October 2012, Michael had earned no income from those two businesses.

¶ 5.   Since Michael purchased the practice in June 2010, he maintained membership in a country club for $10,000 per year and took trips out-of-state to attend business seminars or to investigate investment properties.

¶ 6.   DeAnn's vocational expert presented a report stating that Michael's earning capacity was at least $300,000 by the end of 2012, and $400,000 in 2013 and 2014.

¶ 7.   The parties filed a series of motions following the termination of Michael's employment in September 2009, leading to and providing context for the orders following the October 2012 hearing, which are on review in this appeal.

¶ 8. In April 2010, DeAnn filed a motion asking that the circuit court order family support or order Michael to conduct a "work search." In August 2010, DeAnn filed an amended motion, requesting that the court order Michael to provide tax and income information for 2007–2009, family support for 2007 and 2008, and financial documents about his new practice. In September 2010, Michael filed a motion to terminate family support and establish child support. In March 2011, DeAnn filed a motion requesting certain payments and financial information from Michael for 2007–2010.

¶ 9. On January 9, 2012, the circuit court ordered that: (1) over the next month Michael was to provide financial documents for his practice and file and give DeAnn a copy of his tax returns; (2) DeAnn was to restate her requests and add any new matters and then Michael was to respond; and (3) the parties were to exchange financial statements and take certain actions regarding a vocational evaluation. The court also stated that it took under advisement DeAnn's "request for imputation of $200,000 of income to [Michael] for 2010 based on his failure to complete and provide his 2010 personal income tax returns," and that costs and attorney's fees would be decided at the final hearing.

¶ 10. On January 23, 2012, DeAnn filed a motion incorporating by reference her prior 2010 and 2011 motions and requesting the same relief as in those motions, including: a family support order; an order that Michael undergo a "work search"; payment of outstanding family support for 2009 and for 2010; the preparation of Michael's 2010 tax returns; the imputation of income to Michael; and a retroactive child/family support order starting April 2010.

535

¶ 11.   In March 2012, the circuit court ordered that Michael:   provide financial documents for his practice; file and give DeAnn a copy of his 2010 tax returns; file a financial disclosure statement; cooperate with a vocational evaluation; provide the financial information that was required at the January 9, 2012 hearing or "the Court shall draw an inference contrary to his interests"; and make the outstanding 2009 family support payment.

¶ 12.   The circuit court held a hearing on the motions in October 2012. The court subsequently issued an oral decision in January 2013, an "Order on Hearing" in February 2013, and a final "Amended Order on Hearing" in May 2013. The court found Michael's pursuit of "a job earning no income for 30 months in a profitless business to be voluntary and unreasonable." The court in its amended order: (1) imputed to Michael income of $200,000 per year from September 1, 2010, to November 1, 2012, and $300,000 per year as of November 2012; (2) held open family support and maintenance as of September 1, 2010; (3) required that Michael pay $3,475 per month in child support beginning September 1, 2010, and $4,725 per month beginning November 1, 2012; and (4) required that Michael pay DeAnn's attorney's fees of $13,174.

¶ 13.   In February and March 2013, DeAnn filed a motion and an amended motion requesting payments including the 2010 family support still owing and the child support arrears incurred after the January 2013 decision, a copy of Michael's 2011 tax returns, and an order finding Michael in contempt for failing to pay child support and DeAnn's attorney's fees. Subsequently, the circuit court found Michael in contempt for nonpayment of child support and ultimately ordered that Michael pay $5,000 per month towards child

support, comprising $4,725 as the monthly current support plus $275 towards the arrears of $26,800.

¶ 14. Michael appeals the circuit court's orders imputing income to him based on his earning capacity in order to set child support, finding him in contempt, and requiring him to pay DeAnn's attorney's fees.

## DISCUSSION

¶ 15. Michael contends that the circuit court erroneously imputed income to him based on his earning capacity in order to set child support, for either one of two reasons. First, Michael argues that the court followed the wrong legal standard in finding that Michael had *unreasonably* chosen to pursue employment that paid no income, instead of determining whether, in light of Michael's involuntary termination from Aurora, he *deliberately* failed "to recover financially." Alternatively, Michael argues that the court's finding was contrary to the great weight and clear preponderance of the evidence. As we explain below, we conclude that the circuit court applied the proper legal standard of reasonableness to the circumstances following Michael's termination from Aurora, and that sufficient evidence supported the court's finding that it was not reasonable for Michael to pursue employment that paid no income. We address each argument in turn.

### *The Proper Legal Standard*

¶ 16. In determining child support, a circuit court may

> consider a parent's earning capacity rather than the parent's actual earnings only if it has concluded that

537

the parent has been "shirking," to use the awkward terminology of past cases. To conclude that a parent is shirking, a circuit court is not required to find that a former spouse deliberately reduced earnings to avoid support obligations or to gain some advantage over the other party. A circuit court need find only that a party's employment decision to reduce or forgo income is voluntary and unreasonable under the circumstances.

. . . .

. . . [T]he legal question of reasonableness in a shirking case is a question of law (ordinarily suitable for independent appellate determination) that is intertwined with the facts (ordinarily suitable for appellate court deference to the circuit court).

*Chen v. Warner*, 2005 WI 55, ¶¶ 20, 43, 280 Wis. 2d 344, 695 N.W.2d 758.

¶ 17.   Thus, the application of the legal standard, reasonableness, to the facts is a question of law determined independently by an appellate court, but with appropriate deference to the circuit court because the legal conclusion is extensively intertwined with factual conclusions. *Id.*, ¶¶ 34, 43.

¶ 18.   Michael contends that there are two "shirking test[s]." Specifically, Michael argues that the legal standard of the reasonableness of a parent's employment decision to reduce or forgo income is actually the "second shirking test," and that the "first shirking test" is whether a parent deliberately reduces earnings to avoid paying child support. According to Michael, the circuit court should have applied the "first shirking test" of deliberateness because Michael was involun-

538

tarily terminated from his employment. As we explain, Michael's argument has no support in the law.

¶ 19.  Michael cites two cases for his proposition that there are two "shirking test[s]" of deliberateness and reasonableness, but neither case supports his proposition. He first cites *Chen*, 280 Wis. 2d 344, ¶ 20. However, as quoted above, the Wisconsin Supreme Court in *Chen* articulates the reasonableness standard only and expressly rejects a deliberateness standard. *Id.* ("To conclude that a parent is shirking, a circuit court is not required to find that a former spouse deliberately reduced earnings to avoid support obligations or to gain some advantage over the other party. A circuit court need find only that a party's employment decision to reduce or forgo income is voluntary and unreasonable under the circumstances.").

¶ 20.  Michael's suggestion that the test should be different where, as here, the parent was involuntarily terminated from employment, finds no foundation in his citation to *Chen*. Rather, the unreasonableness standard is broadly set forth in *Chen* to include all employment decisions made by a parent, regardless of the circumstances that led to the making of those decisions. After reviewing the case law, the *Chen* court concludes, "Whether the shirking test is phrased as 'voluntary and reasonable' or with the additional language 'commensurate with the obligations to the children,' " the test of reasonableness is the same:  "that '[a] parent remains obligated to make reasonable choices that will not deprive his or her children of the support to which they are entitled.' " *Chen*, 280 Wis. 2d 344, ¶ 25 (quoted source omitted). Michael focuses on his involuntary termination, but the standard set forth by the supreme court in *Chen* turns the focus to

Michael's employment decisions subsequent to that termination, and subjects those decisions by Michael to the test of reasonableness under the circumstances.[1]

¶ 21. Michael also cites to the pre-*Chen* case *Van Offeren v. Van Offeren*, 173 Wis. 2d 482, 492, 496 N.W.2d 660 (Ct. App. 1992). There, this court stated that, "Shirking is established where the obligor intentionally avoids the duty to support or where the obligor unreasonably diminishes or terminates his or her income in light of the support obligation." *Id.* We understand the former to refer to a parent who "is trying to avoid his or her support obligations," while the latter refers to whether a parent's employment decisions are reasonable " 'commensurate with' " the parent's child support obligations in the absence of such intent. *See In re Paternity of R.L.M.*, 143 Wis. 2d 849, 852–53, 422

---

[1] Michael argues that the focus on his involuntary termination rather than on his employment decisions that followed termination is supported by the pre-*Chen* case *Wallen v. Wallen*, 139 Wis. 2d 217, 226, 407 N.W.2d 293 (Ct. App. 1987) ("When a parent's change in financial circumstances is initially nonvolitional, there should be positive evidence of his or her bad faith in failing to recover financially unless the trial court can find that the parent's explanation or circumstances are inherently improbable or the parent's veracity is discredited."). However, the citation following that statement, to *Ashraf v. Ashraf*, 134 Wis. 2d 336, 345, 397 N.W.2d 128 (Ct. App. 1986), indicates that the concern in *Wallen* was with the circuit court's rejecting uncontradicted testimony without evidence that discredited that testimony or rendered it improbable. Significantly, and contrary to Michael's argument, this court in *Wallen* focused precisely on the parent's employment decisions after termination and reversed because the circuit court found those post-termination employment decisions to be improbable without any evidence. *Id.*, 139 Wis. 2d at 226–27. As we explain below, the circuit court's findings as to Michael's post-termination employment decisions in this case are sufficiently supported by the evidence.

N.W.2d 890 (Ct. App. 1988) (quoted source omitted) (cited by *Van Offeren*, 173 Wis. 2d at 492). Drawing on *R.L.M.* and *Van Offeren* and other cases, the supreme court in *Chen* stated that there is one uniform standard to be applied to a parent's "conduct in voluntarily reducing his or her income," and that standard is "a test of reasonableness under the circumstances." *Chen*, 280 Wis. 2d 344, ¶ 25. The "conduct in voluntarily reducing his or her income" at issue in this case comprises Michael's post-termination employment decisions, and we conclude that the circuit court properly applied the "reasonableness under the circumstances" standard to those decisions.

¶ 22. In sum, neither of the cases Michael cites supports his proposition that there is a "first shirking test" of *deliberateness* in addition to a "second shirking test" of *reasonableness*. Rather, there is only one standard, based on reasonableness under the circumstances, and the circuit court properly applied that standard here.

## Sufficiency of the Evidence

¶ 23. Michael argues in the alternative that the circuit court's determination that Michael "made an employment decision to reduce or forgo income that was voluntary and unreasonable under the circumstances . . . is against the great weight and clear preponderance of the evidence," for three reasons. First, Michael asserts that the court's determination is factually unsupported because it "ignores" Michael's termination, which "was unilaterally visited upon him by his former employer." The problem with this assertion is that, under the standard set forth above, the focus of the circuit court's inquiry was properly on the volun-

tary employment decisions that Michael made after his termination. As the circuit noted,

> We are here because the work that he does doesn't pay him. The petitioner and the respondent both argued that Dr. Becker did not deliberately reduce his income by leaving the employment of Aurora and the Court agrees. Dr. Becker was involuntarily terminated. The real issue in this case is whether or not it is reasonable for Dr. Becker to work in a job for 30 months and continue to deplete his financial resources and operate a business and spend significant time and money delving into start-up ventures while ignoring his obligation to his children . . . .

¶ 24. The circuit court recognized Michael's involuntary termination, but then reviewed the facts relevant to the reasonableness of Michael's employment decisions that followed. The court reviewed facts showing that:

- DeAnn had solely supported the Becker children since January 2010 relying on her savings because though she had returned to work as a nurse her doctor had recommended that she reduce her hours of work because of health conditions;

- Michael had tried to find employment with another medical group but private practice was diminishing because of the decreasing reimbursement from Medicare and the increasing cost of maintaining private facilities;

- Michael's new practice had lost money from the day of purchase until September 2012 when the practice paid him approximately $1,700;

- Michael paid about $10,000 per year for a country club membership and made trips around the country to attend business seminars or investigate in-

542

vestment properties and was evasive about the purposes of some of the trips;

- Michael worked approximately eight hours per week on other business ventures that had not produced any income;

- Michael testified that he recently began doing his best to find a job but did not testify about when and where he was searching for work;

- According to a vocational assessment Michael's earning capacity was between $300,000 and $500,000 per year;

- Michael had not yet produced his 2010 or 2011 tax returns, and "without Dr. Becker's tax returns it's difficult for Ms. Becker or the Court to understand Dr. Becker's financial situation."

The court then stated that the question before it was "[w]hether it is reasonable for Dr. Becker to work at a failing business for the benefit of employees, his patients and a three year lease while not fulfilling his obligation to support his children." The court noted that Michael "decided to buy a business going in knowing that Medicare payments were dropping and the cost of doing business was going up [and that] he had problems managing his business and getting things done timely." The court noted Michael's failure to provide financial information, as "count[ing] against [Michael] as to his credibility and whether or not [the court] should understand and believe that he did everything he could."

¶ 25.  We conclude that sufficient evidence in the record supported the circuit court's finding that Michael's decision after his involuntary termination "to

go into this practice knowing full-well that he couldn't make any money" was unreasonable under the circumstances.

¶ 26. Second, Michael asserts that the circuit court's determination is factually unsupported because there is "no evidence in the record demonstrating any alternative that was available to [Michael] that was rejected by him." To the contrary, Michael himself testified that, other than working at the large Milwaukee hospitals that had no opening for him or starting his own practice, "[t]he only reasonable alternatives available were out of town alternatives, out of state alternatives," but Michael did not seek employment opportunities outside of Milwaukee. He testified that just before the October 2012 hearing, he had begun researching positions "that might have [him] go to another community a day a week and get paid some money." The circuit court found that Michael testified that he "could have gone out and sought employment in another location, either out of the county or out of state," that he "could have [looked at other such jobs] well before the last couple of months," and that he "had a choice to be a cardiologist." We conclude that the circuit court's findings as to the alternatives available to Michael were sufficiently supported by the evidence in the record.

¶ 27. Third, Michael asserts that the circuit court's determination that "it was unreasonable for him to go into this practice knowing full well that he couldn't make any money" is factually unsupported because Michael presented evidence that in the month before the hearing Michael earned approximately $1,700 in income from the practice. Michael's argument ignores the court's reliance on facts showing that the business had not made any profit for the prior twenty-

six months during which time Michael invested in other businesses and incurred significant life-style expenses and did not seek employment "in another location." Michael's argument also ignores the court's determination that it could not accept Michael's representation that he was not making any money in the absence of "full disclosure" of financial information including tax returns. The court found that in light of all the facts before it, it was unreasonable for Michael not "to bring some money in," and we conclude that the evidence in the record sufficiently supports that finding.

### Attorney's Fees and Contempt

¶ 28. Michael bases his challenge to the attorney's fees and contempt orders solely on his claim that the circuit court erroneously imputed income to him based on his earning capacity to set child support, on the grounds set forth above. Because we have rejected those grounds, Michael's remaining issues on appeal fall away.

### CONCLUSION

¶ 29. For the reasons stated above, we conclude that the circuit court properly imputed income to Michael based on his earning capacity to set child support, and we therefore affirm the court's orders setting child support, awarding attorney's fees to DeAnn Becker, and finding Michael in contempt for not making child support payments.

*By the Court.*—Orders affirmed.