IN RE the MARRIAGE OF: Cora Lee SCHEUER,
Petitioner-Respondent,

v.

Bradley SCHEUER, Respondent-Appellant.

Court of Appeals

*No. 2004AP3162. Submitted on briefs February 6, 2006.
—Decided February 22, 2006.*

2006 WI App 38

(Also reported in 711 N.W.2d 698.)

251

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Jason W. Whitley* of *Novitzke, Gust, Sempf & Whitley*, Amery.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Kathleen M. Gionis* of *Gionis Law Office*, St. Croix Falls.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. HOOVER, P.J.   Bradley Scheuer appeals a judgment of divorce and an order denying reconsideration, alleging two errors. First, Bradley argues the trial court erred when it based its maintenance order on Bradley's earning capacity rather than his actual income. Second, Bradley contends the trial court failed to consider tax consequences when it divided the marital estate. Because we discern no erroneous exercise of

discretion by the trial court, we affirm the judgment and order.

## Background

¶ 2. Bradley and Cora Lee Scheuer were married July 29, 1978. Cora petitioned for divorce on April 23, 2003. The couple had two children, but both were adults at the time of the divorce.

¶ 3. Bradley had been employed at Andersen Windows for twenty-three years, earning approximately $20 an hour. Cora, employed at Wood Goods, was earning around $12.70 an hour. On May 6, 2003, the court commissioner entered a temporary maintenance order, with Bradley paying Cora $300 per month.

¶ 4. In December 2003, the parties had their first appearance before the trial court. One issue was whether maintenance should be reduced or terminated because Bradley had lost his job in July. He had been terminated, and Cora alleged he had been fired for misconduct on the job. According to Cora's testimony, Bradley had told her he would rather just quit his job than pay maintenance. She also stated he had repeated disciplinary problems at work, particularly with his supervisors, and had been ordered to attend anger management classes. Bradley admitted he skipped work for five days in a row, although he asserted he had taken vacation days. The court eventually suspended maintenance as of January 1, 2004, and ordered Bradley to seek work. Bradley later found a new job paying $11.74 per hour.

¶ 5. As part of the final divorce decree, however, the trial court imputed an annual earning capacity of $41,875, or $20.13 per hour, to Bradley. The trial court explained:

I'm finding that your earning capacity is $20 per hour and that is based on the fact that you were in a job in which you had long time job security, and an opportunity to continue had it not been for your own misconduct, and your misconduct was the sole reason for your termination and for the now demonstrated and claimed actual lower earnings. Had you not committed misconduct you would have been continuing at a rate of at least $20 per hour.

Based on the imputed earning capacity, the court ordered Bradley to pay maintenance for fifteen years: $400 per month for the first five years, $500 per month for the second five years, and $600 per month for the third five years.

¶ 6.  In the property division, the court attempted to achieve an equal division. Bradley was awarded, among other things, the St. Croix Falls marital homestead valued at $235,000 and subject to a mortgage; eighteen and one-half adjacent acres of land, valued at $52,000; a forty-acre parcel in Webster offset by a parcel Cora received; a 401k plan from Andersen Windows valued at $27,637; and Andersen Windows stock valued at $171,616, which Bradley rolled into an IRA at Edward Jones.

¶ 7.  As a result of the property division, Bradley owed Cora an equalization payment of approximately $125,000. Despite earlier statements to the court indicating he would sell or refinance some of the real estate, Bradley elected to withdraw funds from his IRA to complete the payment, meaning he would pay income tax and penalties on the distribution. Accordingly, he moved for reconsideration of the property division, arguing the tax consequences caused the division to deviate from the equal split the court intended. The court denied the motion. Bradley appeals.

## Discussion

## Maintenance and Imputed Earning Capacity

¶ 8.  Maintenance serves two purposes:  to support the recipient spouse in a manner reflecting the needs and earning capacities of the parties—the support objective—and to ensure a fair and equitable financial arrangement between the spouses—the fairness objective. *Hacker v. Hacker*, 2005 WI App 211, ¶ 9, 287 Wis. 2d 180, 704 N.W.2d 371. Ordinarily, we review a maintenance award for an erroneous exercise of discretion. *Van Offeren v. Van Offeren*, 173 Wis. 2d 482, 492, 496 N.W.2d 660 (Ct. App. 1992).

¶ 9.  This rule, however, is subject to a "shirking" exception. *Id.* When shirking is established, it is appropriate to consider the obligor's earning capacity instead of his or her actual earnings. *Id.* To support a shirking determination, the trial court "need find only that a party's employment decision to reduce or forego income is voluntary and unreasonable under the circumstances." *Chen v. Warner*, 2005 WI 55, ¶ 20, 280 Wis. 2d 344, 695 N.W.2d 758. Ordinarily, the legal question of reasonableness is a question of law, but because the trial court's legal conclusion is so intertwined with the factual findings necessary to support it, we should give weight to the trial court's ruling. *Van Offeren*, 173 Wis. 2d at 492–93. Therefore, we review a shirking determination as a question of law, but one to which we pay appropriate deference. *Chen*, 280 Wis. 2d 344, ¶ 43 (adopting *Van Offeren* standard); *Van Offeren*, 173 Wis. 2d at 493.

¶ 10. Bradley asserts it was improper to impute his earning capacity without expert testimony about his actual capacity. Aside from the fact that he never attempted to offer such testimony, Bradley cites absolutely no authority for his proposition. We need not address arguments unsupported by reference to legal authority. *Kruczek v. Department of Workforce Dev.*, 2005 WI App 12, ¶ 32, 278 Wis. 2d 563, 692 N.W.2d 286 (Ct. App. 2004). Further, under the facts of this case, expert testimony was not necessary to assist the court in determining Bradley's earning capacity. The trial court properly considered Bradley's demonstrated earning ability—the wage he had been earning at Andersen Windows—in determining his earning capacity for calculating maintenance.

¶ 11. Bradley complains that the trial court never found he was shirking, nor did it determine he intentionally lost his job to avoid paying maintenance. But "shirking" does not require a finding the obligor reduced his or her earnings for the purposes of avoiding the maintenance obligation, nor must the court specifically use the word "shirking." *See Smith v. Smith*, 177 Wis. 2d 128, 137, 501 N.W.2d 850 (Ct. App. 1993). The test is whether the reduction in actual earnings was voluntary and unreasonable under the circumstances. *Id.*

> There is no set list of factors which are decisive in a shirking determination. However, perhaps the most common factor accompanying such a finding is a voluntary of self-inflicted change in financial circumstances. For example, in such cases . . . [the obligor] *has been fired or demoted for misconduct* . . . or by some other means has brought about his or her reduced ability to pay support.

*Wallen v. Wallen*, 139 Wis. 2d 217, 225–26, 407 N.W.2d 293 (Ct. App. 1987) (emphasis added; internal citations omitted).

¶ 12.   In this case, the court found Bradley's actual earnings were reduced because of his voluntary misconduct at Andersen Windows, thus justifying use of imputed earning capacity. The court also found Bradley's misconduct at work resulted from his unwillingness to deal realistically and reasonably with his divorce and was the sole reason he was terminated. We discern no clear error in the trial court's factual findings and, accordingly, we agree with its implicit conclusion of Bradley's unreasonableness. Thus, the trial court did not erroneously exercise its discretion in setting a maintenance award based on imputed, rather than actual earning capacity.

## Tax Consequences and Property Division

¶ 13.   When dividing the marital estate, the court starts from a presumption of an equal division. WIS. STAT. § 767.255 (2003–04). In dividing the estate, the court is to consider a multitude of factors, including the tax consequences to the parties. WIS. STAT. § 767.255(3)(k). Property division is a discretionary determination. *Preiss v. Preiss*, 2000 WI App 185, ¶ 10, 238 Wis. 2d 368, 617 N.W.2d 514.

¶ 14.   Bradley argues the court attempted a 50/50 division, but "the practical application of the order resulted in a harsh and unequal division of property." His basis for this assertion is the "consequences and the cost of asset liquidation"—allegedly $20,000–$45,000 depending on how the Internal Revenue Service would

penalize him—after Bradley decided he would have to withdraw funds from his Edward Jones account to make the equalization payment.

¶ 15.    Bradley's argument fails for two reasons. First, the record reveals that while the trial court attempted an equal split down to the penny, its final determination was skewed slightly because Bradley had concealed or failed to account for approximately $14,000–$16,000 worth of stock. Because an element of equity underlies the statutory presumption, it is difficult to accept Bradley's complaint of an unequal division when he was less than forthright from the beginning, tipping the balance in his own favor.

¶ 16.    More substantively, however, the record does not bear out Bradley's complaint. Bradley repeatedly referred to selling the marital home, and was warned by the trial court of the tax consequences of an IRA withdrawal, but presented no evidence of any income taxes or related penalties for the court to consider until after the court had settled the property division.

¶ 17.    At the first motion hearing in December 2003, when Bradley protested Cora's proposed sale of an investment property because he thought her appraised value was too low, the court suggested putting the property in Bradley's column at his price, but warned that Bradley might have to sell some assets:

> THE COURT:   The easy way to do this is just put it in . . . Mr. Scheuer's column. He is the one that thinks it's worth all that money . . . .

> [CORA'S ATTORNEY]:   We can do that. I don't know how he is going to come up with the money to pay her off because he wants the marital homestead and then —

259

THE COURT: — he might have to sell something. If he is here asserting today that it is worth all that money then I guess he's going to have to — is that what you want to do . . .?

Later at that hearing, when Bradley was examined on how he was paying the mortgage on the marital estate, he indicated he had been making withdrawals from a smaller retirement account. When asked how he would pay the mortgage when the account was depleted, he answered, "I'm going to have to sell my house, obviously."

¶ 18. On the first day of trial, the court asked Bradley about the marital homestead:

THE COURT: Okay, one of the things we need to do today, though, is we need to try and develop some idea here, it looks to me like there's going to be a huge amount of money. You want the house; is that right, Mr. Scheuer?

[BRADLEY]: No, I'll sell it.

THE COURT: Pardon?

[BRADLEY]: I'll have to sell it.

THE COURT: Well, do you want . . . to take it at this 235 and you sell it and if it sells for more than that you get whatever it is that sells for and if it's less you get whatever is less, or do you want an order for the house to be sold?

[BRADLEY]: No, I'll take it at 235.

¶ 19. The court then asked Bradley if he understood he would owe Cora "a ton of money," and asked how long Bradley would need to sell the land or borrow against it to come up with the equalization payment money.

260

[BRADLEY]:   Well, then, depends on what I'm going to do. I mean I still — if we get it all said and done I can pull part it of it out of my Edward Jones. See what I'm saying? So I won't have to sell it all —

THE COURT:   Sir, I understand that, but . . . I'm going to tell you there's some significant tax implications to pulling it out of your Edwards Jones account.

[BRADLEY]:   Well, yes, I know that.

THE COURT:   Okay, so you know those are financial decisions you're going to have to make and I can't advise you on . . . .

¶ 20.   On the second day of trial, when Cora asked the court to order Bradley to refinance the home and remove her name from the mortgage, the court replied, "I don't know that I am going to require him to refinance. He's selling the house; it would make no sense to go through refinancing costs at this point."

¶ 21.   At no point during the trial did Bradley dispute the court's inherent assumption he would be selling the home. Even on appeal, Bradley does not claim the trial court erroneously held he had intended to sell the home to make the equalization payment. Moreover, it was not until the hearing on the motion for reconsideration that Bradley mentioned anything further about withdrawing from the IRA and incurring penalties. Even then, no information was presented, but rather, only his counsel's assertion that the IRS would penalize him anywhere from $20,000 to $45,000. The court ruled:

[Bradley] presented at the time of trial that his intention was to refinance the St. Croix Falls property and that that would not result in any tax consequences. He didn't say that that would not result in any tax conse-

quences, but the Court considered how he was going to do his — or how he was going to pay this at the time of trial, and apparently now he's saying that he's going to withdraw it from this Edward Jones account?

. . . .

He should have done what he said he was going to do . . . [Bradley] absolutely was obsessed with having that St. Croix Falls real estate. That was of pinnacle importance to him, and he was going to use it to refinance it and pay her off her property settlement, and there was no mention until [this] morning that he was going to invade this Edward Jones account or that he would be required to . . . and that's what would trigger the tax consequences.

¶ 22. Indeed, after the court made its observations, Cora's attorney asked Bradley whether he had attempted to sell his parcel in Webster. He responded, "Well, why should I?" When the attorney asked if he attempted to sell any of the St. Croix Falls property, he answered, "Well, why should I have to sell my property?" It is therefore not surprising the court also stated that Bradley had been "an obstructionist . . . with regard to resolving this case almost from Day One . . . ."

¶ 23. Ultimately, this is not a situation where the trial court ordered an asset sold and its proceeds credited to one party without also considering the resulting tax liabilities, such as capital gains, and offsetting them in the final calculation. Rather, the court granted Bradley the assets he requested despite the court's offer to order the homestead sold, and despite the court's admonition that a large equalization payment to Cora would be necessary. Since it was anticipated that Bradley would sell or refinance the property, there was no reason for the court to have considered the tax consequences of Bradley's with-

drawal from his IRA. That Bradley ultimately chose to raise funds through a method that resulted in significant penalties to himself is his erroneous exercise of discretion, not the trial court's.

*By the Court.*—Judgment and order affirmed.