COURT OF APPEALS
DECISION
DATED AND FILED

December 23, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2025AP558**

STATE OF WISCONSIN

Cir. Ct. No.  1997FA501

IN COURT OF APPEALS
DISTRICT IV

IN RE THE MARRIAGE OF:

ANN MARIE JAHIMIAK,

PETITIONER-RESPONDENT,

V.

DAVID RALPH JAHIMIAK,

RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for La Crosse County: SCOTT L. HORNE, Judge. *Affirmed*.

Before Graham, P.J., Blanchard, and Kloppenburg, JJ.

¶1    BLANCHARD, J.   David Jahimiak appeals an order of the circuit court reducing his obligation to pay maintenance to Ann Marie Jahimiak under their 1999 judgment of divorce, arguing that the court should have lowered the

maintenance further.[1]  This court reversed an earlier order modifying maintenance. *Jahimiak v. Jahimiak*, 2024 WI App 5, ¶3, 410 Wis. 2d 557, 2 N.W.3d 756 (concluding that the circuit court failed to adequately explain the basis for modification of maintenance).  Following remand, the circuit court entered the order that David now appeals.  The modification that David now challenges assigns different payment amounts to each of three time periods, stepping the amount down from one period to the next.

¶2      David argues that the circuit court on remand erred in the following ways, including by failing to act consistently with this court's decision in *Jahimiak*.  David argues that the circuit court improperly imputed income to him based on his ownership of both a rental office building and funds in a stock trading account.  In addition, David challenges the following aspects of the court's stepped-down maintenance structure: beginning the first step-down period on December 1, 2024, instead of beginning it on the earlier effective date of the reversed order, October 1, 2022, if not earlier still; using the step-down structure in any manner, instead of ordering that David pay the lowest amount as soon as the order became effective; and ordering that the final step-down period be indefinite.  We address each of these arguments and conclude that David fails to show that the circuit court erroneously exercised its discretion or failed to act consistently with this court's decision in *Jahimiak*.  Accordingly, we affirm.

---

[1] We refer to the parties after this point by their first names because they share a last name.

## BACKGROUND

¶3      In our 2023 decision, we highlighted the following background of this case to that time:

> By the time of the 1999 divorce, Ann and David had been married for more than 27 years. At that time, Ann was 49, worked as a sales clerk part time, and attended college part time. David was 51 and worked as a self-employed dentist. The circuit court awarded Ann "permanent spousal maintenance of $4,500 per month," which "shall continue until the death of either party or [Ann's] remarriage." However, despite using the term "permanent," the court also stated that "[t]he amount of maintenance may be reviewed by the Court when [David] reaches an appropriate age of retirement, which this Court now anticipates being age 65."

*Jahimiak*, 410 Wis. 2d 557, ¶5 (footnote omitted).[2]

¶4      In October 2021, when he was 74, David filed a motion to terminate maintenance, expressing plans to undergo surgery and then retire from his practice as a dentist. *See id.*, ¶7. After taking evidence on the issue, Judge Gonzalez issued a written order in February 2023 that required David to pay Ann $3,850 per month in maintenance, which was a reduction from the $4,500 that Judge Damon ordered in 1999. *Id.*, ¶¶5-6, 11. This obligation was effective as of October 1, 2022, and it was indefinite, in the sense that it would end with the death of either party or Ann's remarriage. *See id.*

---

[2] The Hon. John A. Damon presided at the time of the divorce in 1999 and made the maintenance award described in *Jahimiak v. Jahimiak*, 2024 WI App 5, ¶5, 410 Wis. 2d 557, 2 N.W.3d 756). The maintenance rulings challenged in the 2023 appeal were made by the Hon. Ramona A. Gonzalez. All rulings following remand were made by the Hon. Scott L. Horne.

¶5    David appealed the February 2023 maintenance order.    David contended in pertinent part that Judge Gonzalez erroneously exercised the court's discretion in failing to set his modified maintenance obligation at a lower level. *See id.*, ¶¶3, 54.  This court concluded that the court did not adequately explain how it arrived at a maintenance award of $3,850 per month and that we were unable to discern a basis for that amount in the record.    *See id.*, ¶¶55-56. Accordingly, we reversed the February 2023 order and remanded for the court to exercise its discretion as to whether it should modify maintenance, and if so, in what amount, consistent with our opinion. *See id.*, ¶¶57-58 & n.12, 66.

¶6    On remand, as pertinent to the maintenance topic, neither party sought to offer, and Judge Horne did not require, new evidence.  Instead, the parties agreed to abide by Judge Horne's reliance on the factual record as it existed at the time of Judge Gonzalez's February 2023 decision.  *See id.*, ¶58 (directing circuit court on remand to "consider whether, in its judgment, it is appropriate for the court to decide" the motion for maintenance modification based on existing record and arguments).   Judge Horne held two hearings and considered the submission of materials by the parties, analyzing the evidence contained in the record created before Judge Gonzalez.

¶7    At one of these hearings, Judge Horne explained in an oral ruling that the maintenance order would be indefinite in its length.  The court later issued a written order modifying the amount of David's maintenance obligation. Specifically, David would pay Ann maintenance at specified amounts during three periods: $3,500 per month from December 1, 2024 to June 30, 2025; $2,800 per month from July 1, 2025 to December 31, 2025; and $2,200 per month beginning

January 1, 2026, and continuing indefinitely.[3]  The court considered and rejected arguments that David raised in a motion for reconsideration.  David appeals.

## DISCUSSION

¶8      David's arguments on appeal challenge aspects of Judge Horne's exercise of discretion in modifying the order requiring David to pay maintenance under WIS. STAT. § 767.59 (2023-24) following remand.[4]

¶9      "A circuit court 'may' '[r]evise and alter' a divorce maintenance award when the movant demonstrates 'a substantial change in circumstances warranting the proposed modification.'"  *Jahimiak*, 410 Wis. 2d 557, ¶42 (citing WIS. STAT. § 767.59(1c)(a)1., (1f)(a); *Rohde-Giovanni v. Baumgart*, 2004 WI 27, ¶30, 269 Wis. 2d 598, 676 N.W.2d 452).  Here, as Judge Horne noted on remand, there is no dispute that David's retirement constitutes a substantial change in financial circumstances that justified the court's consideration of whether to modify the maintenance award that existed before Judge Gonzalez issued her modification order.  *See id.* (citing *Licary v. Licary*, 168 Wis. 2d 686, 692, 484 N.W.2d 371 (Ct. App. 1992)).

¶10   When setting maintenance pursuant to a motion to modify maintenance under WIS. STAT. § 767.59, the circuit court must consider two objectives: "support[ing] the recipient spouse in accordance with the needs and earning capacities of both the recipient spouse and the payor spouse," and

---

[3]  This summary takes into account one minor correction that the court circuit made in a later order that is not disputed on appeal.

[4]  All references to the Wisconsin Statutes are to the 2023-24 version.

"ensur[ing] that there is a fair and equitable financial arrangement between the parties." ***Rohde-Giovanni***, 269 Wis. 2d 598, ¶¶29, 31.

> ¶11 We identified pertinent legal standards in our earlier decision:
>
>> If there has been a substantial change of circumstances, the decision whether to modify the amount or duration of maintenance is committed to the circuit court's sound discretion. ***Rohde-Giovanni***, 269 Wis. 2d 598, ¶17.
>>
>> An erroneous exercise of discretion involves a failure to consider the relevant factors, basing an award on factual errors, making an error of law, or granting an excessive or inadequate award. ***Id.***, ¶18. "[A] discretionary determination must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination." ***Hartung v. Hartung***, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981). We affirm if the court "examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." ***Long v. Long***, 196 Wis. 2d 691, 695, 539 N.W.2d 462 (Ct. App. 1995).

***Jahimiak***, 410 Wis. 2d 557, ¶¶45-46.

¶12 We review the circuit court's findings of fact under a clearly erroneous standard. ***Sellers v. Sellers***, 201 Wis. 2d 578, 586, 549 N.W.2d 481 (Ct. App. 1996) (citing WIS. STAT. § 805.17(2)). "Under this standard, even though the evidence would permit a contrary finding, findings of fact will be affirmed on appeal as long as the evidence would permit a reasonable person to make the finding." ***Id.*** To conclude that a finding is clearly erroneous, a court must determine that "the evidence supporting a contrary finding … constitute[s] the great weight and clear preponderance of the evidence." *See **id.***

**I. Imputation of Income**

¶13    David argues that Judge Horne erred by imputing income to him based on his ownership of a rental office building and funds in a stock market trading account.  We provide pertinent legal standards before addressing the circuit court's treatment of each source of imputed income.

¶14    When a circuit court determines that a party is "shirking" in connection with potential income, it is appropriate for maintenance purposes "to consider the [party's] earning capacity instead of his or her actual earnings." *Scheuer v. Scheuer*, 2006 WI App 38, ¶9, 290 Wis. 2d 250, 711 N.W.2d 698. The determination that a party is shirking "does not require a finding [that] the obligor reduced his or her earnings for the purposes of avoiding the maintenance obligation, nor must the court specifically use the word 'shirking.'"  *Id.*, ¶11. Instead, "[t]he test is whether the reduction in actual earnings was voluntary and unreasonable under the circumstances."  *Id.*  "There is no set list of factors which are decisive in a shirking determination … [but] perhaps the most common factor accompanying such a finding is a voluntary or self-inflicted change in financial circumstances."  *Wallen v. Wallen*, 139 Wis. 2d 217, 225-26, 407 N.W.2d 293 (Ct. App. 1987); *Scheuer*, 290 Wis. 2d 250, ¶11.

¶15    We review a circuit court's resolution of a claim of shirking as an issue of law, but one that "is so intertwined with factual findings necessary to support it," that we give "appropriate deference" to the circuit court.  *See Scheuer*, 290 Wis. 2d 250, ¶9 (citing *Van Offeren v. Van Offeren*, 173 Wis. 2d 482, 492-93, 496 N.W.2d 660 (Ct. App. 1992); *Chen v. Warner*, 2005 WI 55, ¶43, 280 Wis. 2d 344, 695 N.W.2d 758).

*Income Imputed for Building Ownership*

¶16    Judge Damon in the original divorce proceedings awarded David ownership of the rental office building as part of the property division. At the time, David stipulated that it was worth $350,000. Judge Horne noted that, in 2022, Judge Gonzalez found that the property could reasonably be expected to realize $600,000 in sales proceeds, which could be invested conservatively at an expected rate of return of 4 percent. Judge Gonzalez further found that: sometime before the evidentiary hearings in 2022, David listed the property for sale at $799,000; David then became concerned that if he sold the building by the time of the 2022 hearings, Judge Gonzalez would consider the proceeds in determining his earning capacity; for that reason, David raised the listed price to $919,000, even though he had received no offers at the listed price of $799,000, to avoid consummating a sale before the court ruled on his motion to modify maintenance. Based on this, and the value of the property at the time of the divorce, Judge Gonzalez determined that it could be reasonably inferred that the sale of the property could produce $600,000, from which David could earn income. Adopting these findings, Judge Horne found that it was reasonable to impute to David an additional earning capacity of $24,000 based on building ownership, as Judge Gonzalez had also found.

¶17    In addressing David's motion for reconsideration, Judge Horne added the following observations on the topic of the building. From the time of the divorce onward, David owned the building and used it as "income-producing property." Further, David had "expressed an awareness" of strategies "that he could use to zero out income [related to the building] for maintenance purposes." More specifically, Judge Horne determined that over time David elected "to use income-producing property in a way that resulted in no attributable income for

maintenance purposes," which "was inconsistent with the purpose of the property at the time of the divorce[ and] was an unreasonable decision." The court determined that this "warranted imputation of income."

¶18 Employing the "appropriate deference" to findings of the circuit court that is called for under *Scheuer*, we affirm Judge Horne's determination that David's handling of the building constituted a form of shirking in a way that creates potential income for him to take into account for purposes of maintenance.

¶19 David contends that there is no evidence that he took improper actions in connection with the building, such as intentionally holding onto it for the purpose of reducing his income. This argument misapplies the test for shirking and income imputation to the facts found by the circuit court. For example, David does not dispute that he took the voluntary actions of listing the building for sale first at $799,000 and then at $919,000 during the times that Judges Gonzalez and Horne considered relevant. The two judges also both found that the timing could support a reasonable inference that he intentionally delayed realization of the actual value from the property until after the modification motion was resolved by Judge Gonzalez. But that finding of intentional avoidance of income was not necessary to support the court's decision on imputation. *See Scheuer*, 290 Wis. 2d

250, ¶11. The more relevant point is that David fails to show clear error in Judge Horne's findings that his actions were unreasonable under the circumstances.[5]

¶20 Turning to the potential sale price of the building found by Judge Horne, David asserts that there is no basis in the record for the shared finding of Judges Gonzalez and Horne that the building was worth $600,000. David contends that all the record reflects is that David was operating the building at a loss at the time of the maintenance modification hearings before Judge Gonzalez and that David was unable to sell it. As noted above, however, in deriving this estimate of value, Judge Horne took into account the building's value at the time of the divorce and recent list prices for the building. The evidence was not extensive, but David does not persuade us that it was insufficient to sustain the court's approach to imputing income to David based on the value of the building. *See Scheuer*, 290 Wis. 2d 250, ¶10 (rejecting as unsupported argument that "it was improper to impute [maintenance payor's] earning capacity without expert testimony about his actual capacity").

¶21 David further contends that the circuit court's imputation of income based on his ownership of the building is, in his words, "tantamount to requiring David to liquidate an asset to pay maintenance to Ann so that she would not have to liquidate her own assets." *See Dowd v. Dowd*, 167 Wis. 2d 409, 417, 481

---

[5] David characterizes Judge Gonzalez as having determined only that it would have been "reasonable" for David to sell the office building, and that the court did not necessarily determine that it was unreasonable not to sell it. But, as should be evident from our summary of Judge Gonzalez's specific factual findings, this is not a fair interpretation of the court's findings. Further, regardless of Judge Gonzalez's specific findings, David does not clearly explain why Judge Horne could not make further findings or draw additional inferences related to the building that are supported by Judge Gonzalez's factual findings, which David did not attempt to undermine with contrary evidence on remand.

N.W.2d 504 (Ct. App. 1992) (the first spouse "should not be forced to invade" the other spouse's portion of the property division to maintain an adequate lifestyle when the second spouse does not have to invade the second spouse's portion of the division to maintain an adequate lifestyle).    This argument is flawed in several respects.  First, Judge Horne stated that the court's goal in modifying maintenance was not to re-divide assets already distributed to the parties as part of the property division in the original divorce proceedings.    Instead, the court clarified, it assessed only whether David's ownership of the building provided relevant evidence on the topic of David's earning capacity given the circumstances in 2022, as approximated by the building's sale value.  *See Seidlitz v. Seidlitz*, 217 Wis. 2d 82, 90-92, 578 N.W.2d 638 (Ct. App. 1998) (discussing when assets may be "double-counted" for property division and maintenance purposes).    David does not meaningfully address this reasoning.  He merely cites *Dowd* and asserts that the goal of fairness required the court to apply the same logic to Ann's income and potential income.  But he does not develop an argument that Judge Horne should have imputed any particular source of income to Ann.  Moreover, so far as David shows from the record, neither the circuit court nor Ann required or induced him to sell the building.  Instead, David voluntarily decided to hold it out for sale.  From that starting point, Judge Horne assessed the reasonableness of David's decisions in connection with his listing of the building under the relevant circumstances.

*Income Imputed for Trading Account*

¶22    For context regarding the stock trading account, we note that it does not appear to be disputed that, as we stated in our 2023 opinion, by 2022 David was no longer "'involved in stock trading and had approximately $40,000 in assets' in [the] trading account, 'prior to the payment of 2022 [r]eal estate taxes.'"

11

*Jahimiak*, 410 Wis. 2d 557, ¶51 (alteration in *Jahimiak*). As summarized in our prior opinion, Judge Gonzalez accepted Ann's position that part of David's income for maintenance purposes included $3,333 in "stock proceeds," calculated by dividing the $40,000 remaining in the account by 12. *See id.*, ¶50. We reversed in *Jahimiak* in part because the circuit court did not adequately explain this part of its maintenance calculations. *See id.*, ¶¶50, 55. Following remand, Judge Horne noted that Judge Gonzalez's approach essentially imputed to David income from the remaining assets in a manner which assumed that David would exhaust those funds within approximately one year.

¶23 Judge Horne took a different approach. The circuit court considered the trading account assets in the following manner. First, the court used calculations regarding the parties' incomes and expenses that were submitted by the parties as a "starting point" for its maintenance award. Both parties worked from the same scenario, which was that David would retain 55% of the parties' combined income, taking into account the imputation of $24,000 a year in income based on the office building. Ann calculated maintenance under this scenario at $1,701 per month, and David calculated it to be $1,517 per month. The court considered these two numbers to collectively form a "starting point," which implied that the court worked from something like an average of the two numbers. The court adjusted upward from this "starting point," in order to account for the imputation, attributing "some level of income" to David based on the value of the stock trading account and his handling of it. This resulted in the court arriving at David's monthly maintenance obligation, after the steps down, of $2,200.

¶24 Judge Horne further explained that the court was not assigning to David "a specific dollar value" from the stock trading account, but instead was merely relying on evidence that "supports the conclusions reached by Judge

12

Damon and Judge Gonzalez that [David's] management of the account revealed strategic decisions to reduce the value of the accounts immediately prior to maintenance determinations." This, "coupled with indications" that David had "greater assets available than may appear, warrant[ed] a modest revision upward" of the court's estimation of David's maintenance obligation from what it otherwise would be, based on other considerations. The result of this approach would appear to be that, based on David's control of the remaining stock trading funds, the court imputed to him as income the average of $499 per month (based on Ann's maintenance calculation) and $683 per month (based on David's maintenance calculation), or $591 per month.

¶25 Imputation of income appears to most often arise in divorce cases in connection with allegations of voluntary unemployment or underemployment. But David does not challenge the premise of Judge Horne's approach that a circuit court may also impute income to a party when the party intentionally mismanages a stock trading account that could represent a source of income. We consider the court's premise to have been valid. Instead, David asserts that there was "no evidence" that he deliberately lost money through trading in this account, even though Judges Damon and Gonzalez both made contrary findings. We reject this assertion because David falls well short of developing an argument that the circuit court clearly erred in making findings on that topic at any relevant point in the history of this case. *See Jahimiak*, 410 Wis. 2d 557, ¶58 n.12 (rejecting argument that circuit court could not find that David "deliberately lost" money through stock trading on the ground that it "defied logic"). For example, David asserts that there is "no evidence" that Judge Horne's imputation of income to David "was anywhere near the amount" "that he generated prior to" the significant losses to the account in recent years. But on appeal it is David's burden to establish clear

13

error, and he does not attempt to show that the court's imputation of income is unsupportable given relevant evidence, including the history of the account's growth and losses, and how much money remained in the account at the relevant time.

## II. Effective Date of Modified Maintenance

¶26    David argues that the circuit court erred in setting the beginning of the first maintenance step-down period to be December 1, 2024. Instead, David contends, the court should have chosen October 1, 2022, if not earlier.[6]    To repeat, October 1, 2022, was the effective date of the maintenance modification order that this court reversed. *See id.*, ¶¶4, 11, 41. For the most part, David frames his argument as a challenge to Judge Horne rendering a decision that was not consistent with this court's decision in *Jahimiak*. But, in the alternative, he contends that, even if the circuit court did not contradict our direction in *Jahimiak*, it otherwise erroneously exercised its discretion in setting the commencement date because there was no evidence to support that date. We first address this court's mandate and reasoning in *Jahimiak*, explaining why we conclude that our opinion did not prohibit the approach that the circuit court took on remand. Then we address David's contention that the court otherwise erroneously exercised its discretion on this issue.

---

[6] David suggests that the circuit court should have or could have exercised its discretion to set the effective date even earlier than October 1, 2022, such as when David retired. But we do not understand David to develop an argument for an earlier date that does not fall with our rejection of his argument for October 1, 2022.

*Law of the Case*

¶27    Under the law of the case doctrine, "'a decision on a legal issue by an appellate court establishes the law of the case, which must be followed in all subsequent proceedings in the [circuit] court ....'" *See **State v. Moeck***, 2005 WI 57, ¶18 & n.3, 280 Wis. 2d 277, 695 N.W.2d 783 (quoting ***Univest Corp. v. General Split Corp.***, 148 Wis. 2d 29, 38, 435 N.W.2d 234 (1989)).    More generally, "[o]n remand, circuit courts may not take actions 'that conflict with the expressed or implied mandate of the appellate court.'" *See **State v. McAdory***, 2025 WI 30, ¶26, 417 Wis. 2d 194, 22 N.W.3d 844 (citing ***Tietsworth v. Harley-Davidson, Inc.***, 2007 WI 97, ¶32, 303 Wis. 2d 94, 735 N.W.2d 418); WIS. STAT. §§ 808.08-.09.

¶28    We interpret our earlier decision de novo.  *See **Tietsworth***, 303 Wis. 2d 94, ¶22 (supreme court is "final arbiter of the meaning of its own mandates," which it reviews as issues of law); ***Meyers v. Bayer AG, Bayer Corp.***, 2007 WI 99, ¶22, 303 Wis. 2d 295, 735 N.W.2d 448 (application of case law to a set of facts is a matter of law to be decided de novo).

¶29    In our previous decision, we noted that Ann proposed to Judge Gonzalez estimates of David's gross income and that Judge Gonzalez adopted those figures as the court's findings.  *See **Jahimiak***, 410 Wis. 2d 557, ¶¶50, 54.  In the prior appeal, David argued in pertinent part that "there was no evidence before the circuit court to support the specific dividends and interest, rental income, or stock proceeds figures" that Ann attributed to David.  *See **id.***, ¶54.  In line with David's argument on this point, we concluded that Ann failed to "directly dispute David's detailed and supported arguments" that, based on the record that was available to the circuit court: David did not hold income-producing investments;

his rental properties were losing money; and there was no logic to Ann's proposed attribution of monthly income to David based on one-twelfth of the value of his remaining investment funds. *See id.*, ¶55. As a result, this court was "left with considerable uncertainty as to what evidence supported the gross income figures" adopted by the circuit court. *Id.* We were "unable to discern in the [circuit] court's decision any logical path" to a maintenance award of $3,850 per month. *See id.*, ¶56.

¶30 Addressing proceedings that would follow remand, this court stated that it was not "direct[ing] that the circuit court must hold a new evidentiary hearing on remand, nor that the court may not do so." *Id.*, ¶58. Instead, we left the circuit court free to consider whether it was appropriate to decide David's motion for maintenance modification based on the factual record as it existed at the time of the reversed order, and also to decide the extent to which additional argument would be appropriate. *Id.* We clarified that, although we reversed the modification of David's maintenance, our opinion "should not be interpreted as preventing the circuit court from considering the same facts underlying its previous decision." *Id.*

¶31 To recap, in the February 2025 decision modifying maintenance, Judge Horne set the effective date of the first reduction (from $3,850 per month to $3,500) as December 1, 2024.[7] In explaining its selection of this date, the court

---

[7] We assume without deciding that David is correct in asserting that the amount in monthly maintenance that David was obligated to pay Ann from October 1, 2022, through the effective date of the first step-down in Judge Horne's order, December 1, 2024, was $3,850.

(continued)

16

reasoned that, when "principles of fairness and need" are considered, Ann "has a greater need" than David.

¶32    Judge Horne stated that the court could not discern in the record what amount of maintenance David paid from the effective date of the first step-down in Judge Horne's order through the date of Judge Horne's decision. Nevertheless, Judge Horne recognized that, for each month beginning with the effective date of December 1, 2024, through when the order was issued in February 2025, David may have paid more than the $3,500 per month established by Judge Horne's order. For this reason, the court reasoned, "[p]rinciples of fairness require[d]" that David be "compensate[ed]" for any excess payments. Accordingly, the court ordered the parties to submit proposals for how Ann could compensate David for any excess payments.

¶33    David asserts that our reasoning in *Jahimiak* required Judge Horne to give the modification order the same effective start date as Judge Gonzalez's order, which was October 1, 2022. We disagree. There is nothing in our 2023 decision that required this. *See **Benn v. Benn***, 230 Wis. 2d 301, 313, 602 N.W.2d 65 (Ct. App. 1999) (reviewing decision not to make maintenance modification retroactive for erroneous exercise of discretion). To the contrary, this court emphasized that we could not exercise the circuit court's discretion for it in

---

As context for this assumption, we note that neither party clearly explains what David's maintenance obligations were during this interval, given the fact that this court reversed Judge Gonzalez's modification of maintenance. At several points, David asserts without explanation that he was obligated to pay $3,850 per month—that is, the amount ordered by Judge Gonzalez—as opposed to $4,500 per month, which was his maintenance obligation before Judge Gonzalez's order. Ann does not address the topic at all.

We note that neither party now asks this court to address possible arrears, or unpaid maintenance, that might exist from any pertinent time period, and we do not address that topic.

17

structuring a proper maintenance award that accounts for all relevant facts. *See Jahimiak*, 410 Wis. 2d 557, ¶41. In returning the case to the circuit court in effectively the same position that it was in just before Judge Gonzalez issued the February 2023 order, we did not purport to instruct the circuit court what to do regarding the intervening months of maintenance payments between the effective date of the reversed order and whatever Judge Horne's order might state. *See id.*, ¶¶41, 57, 66; *cf. Benn*, 230 Wis. 2d at 314 (instructing court on remand to exercise its discretion to modify maintenance as of a date between a specified range). Judge Horne was free to restrict the evidentiary record to what was available to Judge Gonzalez, as Judge Horne chose to do, without objection by the parties. This leaves David to show that the court on remand erroneously exercised its discretion in arriving at the December 1, 2024, effective date, which, as we now discuss, he fails to do.

*Discretionary Decision to Make Modification Effective December 1, 2024*

¶34 As pertinent here, WIS. STAT. § 767.59(1m) permits circuit courts, when modifying maintenance, to select effective dates falling as early as, but generally no earlier than, "the date that notice of the action" to modify maintenance is given. *Benn*, 230 Wis. 2d at 313 & n.3 (discussing predecessor statute).[8] At the same time, § 767.59(1m) does not require a court to set the effective dates of a modification that early; instead, the modification may be prospective only. *See Benn*, 230 Wis. 2d at 306, 313-14 (concluding that it was

---

[8] Maintenance modifications can be made effective yet earlier, but only to correct "previous errors in calculations." *See* WIS. STAT. § 767.59(1m).

not an erroneous exercise of discretion for the court to make reduced maintenance effective as of the date on which the court ruled on modification).

¶35     David notes that Judge Horne, in denying his motion for reconsideration, stated that "the objective evidence" before the court on remand did not warrant setting modified maintenance at the amounts set in previous orders. From this, David suggests that the court ended up ordering him to pay amounts that the court itself viewed as unjustified by the evidence for the time period leading up to the steps down in maintenance. More specifically, David asserts that the result of Judge Horne's starting date for the first step-down period is that David is obligated to pay the $3,850 per month ordered by Judge Gonzalez for the period October 2022–December 2024, even though Judge Horne acknowledged that that number was not supported by the evidence. *See* note 7, *supra*. But we do not construe Judge Horne's comments this way. The court merely acknowledged that it viewed the evidence concerning David's income as justifying eventually reaching a lower level of maintenance ($2,200) than that ordered by Judge Gonzalez and by court commissioners. This does not stand for the proposition that there was no evidence justifying the step-down transition to that lower amount that the court settled on.

¶36     Explaining further, David is correct that one consequence of how Judge Horne structured the order is that David is obligated to pay more, for the period October 2022–December 2024, than what Judge Horne considered appropriate for the final step-down, based on evidence that was available to Judge Gonzalez in October 2022. But David does not provide support for the proposition that Judge Horne was barred by statutory or case law from ordering the payment of reduced maintenance prospectively, based on other factors relevant to the fairness and support objectives of maintenance. This is the prospective

19

approach that the court decided to take. Judge Horne concluded that Ann's relatively great need, together with the sharp drop in her total income (including maintenance) as a result of maintenance reductions, supported use of a step-down structure that was retroactive to December 2024 and not earlier. As the court put it at the reconsideration hearing, the court was concerned that, because of Ann's relatively greater need, it was necessary to give her time to "absorb" the reduction in her income caused by dropping the amount of maintenance. David, in contrast, had a relatively lesser level of need, due to his larger share of assets, which made it easier for him to "absorb" the reduction in his income caused by his retirement.

¶37　　David argues that the fact that he retired sometime in 2022, at least two years before the December 2024 effective date, undermines the circuit court's rationale in starting its modified maintenance award in December 2024. David emphasizes that Judge Damon in 1999 put Ann on notice that maintenance "may be reviewed by the [c]ourt when [David] reaches an appropriate age of retirement," which the court at that point anticipated would be in or around 2012. *See Jahimiak*, 410 Wis. 2d 557, ¶5 (second alteration in our 2023 *Jahimiak* opinion). Judge Horne said that Judge Damon, in setting the original maintenance award in 1999, made comments that "put all parties on notice" that David's maintenance obligation would be revisited upon David's retirement. But Judge Horne decided not to give significant weight to the precise date of retirement. Instead, Judge Horne decided to use the step-down structure, retroactive to December 2024, given that Ann had a greater financial need than David and given "the substantial reduction" in Ann's "household income" due to the significant drop in the amount of maintenance she would receive each month. It was reasonable for Judge Horne to acknowledge that, while Ann perhaps should have long anticipated that a downward adjustment in maintenance might occur due to

David's retirement, she would nonetheless need time to prepare for the particular scale of the reduction that the court ultimately ordered. One contributing factor in our conclusion on this point is the fact that uncertainty surrounding David's earning capacity, which was apparently not attributable to any action by Ann, lingered throughout these proceedings, both before and after our decision in *Jahimiak* and leading up to Judge Horne's decision.

¶38    David characterizes the circuit court's consideration of Ann's need and the scale of the maintenance reduction as "vague allusions" to the fairness and support objectives. The circuit court's discussion of its effective date and of its use of the step-down structure was not extensive. But so far as David shows, including taking into account his additional arguments that we reject below, it was reasonable for the court to take Ann's relative need and the scale of maintenance reduction into account and to weigh them more heavily than other relevant factors.

## III.  Step-down Reductions in Maintenance

¶39    Related to his argument about the December 2024 start date, David contends that Judge Horne erred in ordering that the reduced monthly maintenance obligation be reached through the three steps, ending with a lowest level of $2,200 in 2026 and beyond. David notes that by January 2026, he will have been obligated to pay more than $2,200 per month for over three years (October 2022–January 2026). We do not understand David, in making this argument, to argue that the circuit court violated any statutory provision or rule from case law using a step-down structure to phase in the reductions over time. Nor does David suggest that we should review the court's decision to use a step-down structure under any standard other than the familiar erroneous exercise of discretion standard for other maintenance decisions. *See Rohde-Giovanni*, 269 Wis. 2d 598, ¶17.

¶40    Instead, David argues that Judge Horne failed to properly exercise the court's discretion in weighing the goals of support and fairness. In particular, David emphasizes that the court's use of a step-down structure results in Ann receiving a substantially higher proportion of the parties' collective income than David receives until the final step down takes effect in January 2026.[9] But this result is consistent with Judge Horne's determination that (1) a particular level ($2,200 per month) was appropriate based on the evidence before the court, while at the same time (2) Ann's greater need and fairness required a significantly lower level of maintenance using the step-down structure. Put differently, David is correct that the court's approach temporarily imposed splits of income that favor Ann, but David fails to show that the court's reasoning for doing this was not one reasonable way for the court to exercise its discretion, given the court's identification of legitimate considerations that favored its step-down structure and the amounts that the court assigned to each step. Moreover, in creating the order, Judge Horne explicitly weighed, out of fairness to David, the potential need to compensate him for excess payments made from the effective date of the order from December 1, 2024, through the date of the order in February 2025. This consideration was smaller in scale than the effects of the court's step-down structure, but it reflects that the court was properly weighing fairness to David.

¶41    More generally, David asserts that the circuit court "completely disregard[ed] that David did not have the earning capacity to pay the levels of

---

[9] David calculates that the circuit court's maintenance modification order following remand gives Ann approximately the following shares of their collective incomes during the pertinent phases: 63% for October 1, 2022–December 1, 2024; 60% for December 1, 2024–July 1, 2025; 53% for July 1, 2025–December 31, 2025; and 49% for January 1, 2026, onward. Ann does not appear to dispute these calculations on appeal.

support ordered." *See* **Rohde-Giovanni**, 269 Wis. 2d 598, ¶29 (support objective of maintenance must be considered "in accordance with the needs and earning capacities of both the recipient spouse and the payor spouse"). We reject this argument as undeveloped. David does not make clear what he uses as a factual basis for this critique. For example, he fails to account for Judge Horne's imputation of income to David that we explain above. On a related point, David emphasizes that his retirement resulted in a significant drop in his income. But the court clearly took this into account in ordering a total maintenance obligation that is significantly lower than what David was paying before the modification ordered by Judge Horne.

¶42 David also asserts that there is "no evidence" that Ann at relevant times would have a greater need than David—that is, less ability to "absorb" changes in his income created by his retirement and the resulting modification to maintenance—given the parties' circumstances in 2022, or at least no need that could justify her receiving a disproportionate share of their collective income. This is not accurate. In Judge Horne's written opinion, the court carefully walked through the findings of the prior two judges in this case and weighed relevant considerations regarding the parties' circumstances from the time of their divorce through 2022.

¶43 Expanding on that point, Judge Horne not only made findings of income that should be imputed to David, as addressed separately above, but also appeared to adopt the following findings of Judges Damon and Gonzalez: David "made efforts to understate his income in an effort to affect the maintenance award to [Ann]"; David's "conduct had the effect of driving up costs of litigation for [Ann]"; and based on "the resources [that David] devoted to litigation," it could reasonably be inferred that David "had greater assets at his disposal than may have

been apparent." In light of these findings, David does not persuade us that Judge Horne's finding that Ann had a greater need is clearly erroneous.

¶44 David makes various references to what he alleges were Ann's failures to properly manage assets awarded to her by Judge Damon and funds that David paid to her at the level of maintenance set by Judge Damon. *See Jahimiak*, 410 Wis. 2d 557, ¶58 n.12 (concluding that circuit court must consider David's argument that Ann "lacked initiative" as a potential factor in modifying maintenance, but "tak[ing] no position on what the circuit court here might find along these lines"). Judge Horne noted these allegations, but the court determined that there was insufficient evidence in the record for the court make findings that would attribute additional income to Ann. Instead, Judge Horne noted Judge Damon's finding that Ann could not become self-supporting and Judge Horne further found that "this has not changed." David briefly notes that in 1999 Judge Damon found that Ann was paying for college courses even though this education was not likely to result in her becoming self-sufficient. David also notes that Ann conceded in an earlier appeal from this case in 2001 "that she had not wisely used her liquid assets" from the divorce property division. *See Jahimiak v. Jahimiak*, No. 2001AP0167, unpublished slip op., ¶7 n.2 (WI App July 6, 2001). But David fails to develop a persuasive argument that Judge Horne needed to consider these brief statements from earlier stages of this case as weighty. David falls well short of showing that Judge Horne clearly erred in assessing the totality of Ann's management of assets from 1999 through 2022 as being adequate under the circumstances.

## IV. Indefinite Maintenance

¶45 David argues that Judge Horne erred in ordering that the final, stepped-down amount of his maintenance obligation be indefinite. *See* ***Rohde-Giovanni***, 269 Wis. 2d 598, ¶17 (duration of maintenance committed to circuit court's discretion). It is difficult to track aspects of David's argument on this issue that we have not already rejected above. But at bottom we understand him to contend that Judge Horne erred by interpreting Judge Damon's order of indefinite maintenance as prohibiting Judge Horne from ordering modified maintenance to terminate after a definite term. We reject this argument because it rests on an unreasonable interpretation of Judge Horne's reasoning.

¶46 Judge Horne began discussion of the term of maintenance by reviewing factual findings and procedural history relating to the original divorce proceedings:

> I am satisfied that Judge Damon envisioned that there would be permanent maintenance. And he had referred to [Ann]'s limitations, needs. And in his original maintenance award, had made a determination that there would be permanent maintenance.
>
> He also understood that [David] at some point would retire, he had envisioned that 65 would be a reasonable retirement age, and had expressed an openness to modify the maintenance when that event occurred.

David appears to interpret Judge Horne as characterizing Judge Damon's award of "permanent" maintenance to be unmodifiable. But this is belied by further comments the court made, which provide important additional context:

> I am inclined to order maintenance.… I'm viewing my role as not redoing the divorce, but really looking at what happened in the case before me. And if it makes sense, adopting the rationale the previous judges have … used. Judge Damon's determination … was that

> maintenance should be permanent and I haven't seen anything in the record that would dissuade me from that.

This reflects that Judge Horne made the modification determination based on the totality of the circumstances reflected in the record established to that point, and not because Judge Horne was under an erroneous belief that Judge Damon's determination could not be modified. Judge Horne expressed an understanding that on remand the court was to decide to what degree Judge Damon's reasoning in setting an indefinite term still comported with the support and fairness objectives of maintenance. Judge Horne decided that it did, and David fails to show why that was an erroneous exercise of discretion.

## CONCLUSION

¶47    For all of these reasons, we affirm the orders of the circuit court.

*By the Court*.—Orders affirmed.

Not recommended for publication in the official reports.